## ATTORNEY GENERAL OF NEW YORK v. SOTO-LOPEZ ET AL.

No. 84–1803.   Argued January 15, 1986—Decided June 17, 1986

BRENNAN, J., announced the judgment of the Court and delivered an opinion, in which MARSHALL, BLACKMUN, and POWELL, JJ., joined. BURGER, C. J., *post*, p. 912, and WHITE, J., *post*, p. 916, filed opinions concurring in the judgment. STEVENS, J., filed a dissenting opinion, *post*, p. 916. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST and STEVENS, JJ., joined, *post*, p. 918.

*Robert Hermann*, Solicitor General of New York, argued the cause for appellant. With him on the brief were *Robert Abrams*, Attorney General, *pro se, O. Peter Sherwood*, Deputy Solicitor General, and *Christopher Keith Hall*, Assistant Attorney General.

*Kenneth Kimerling* argued the cause for appellees. With him on the brief was *Juan Cartagena*.*

JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion, in which JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE POWELL join.

The question presented by this appeal is whether a preference in civil service employment opportunities offered by the State of New York solely to resident veterans who lived in the State at the time they entered military service violates the constitutional rights of resident veterans who lived outside the State when they entered military service.

---

*M. Carolyn Cox* and *Barton F. Stichman* filed a brief for Vietnam Veterans of America as *amicus curiae* urging affirmance.

## I

The State of New York, through its Constitution, N. Y. Const., Art. V, § 6, and its Civil Service Law, N. Y. Civ. Serv. Law § 85 (McKinney 1983 and Supp. 1986), grants a civil service employment preference, in the form of points added to examination scores, to New York residents who are honorably discharged veterans of the United States Armed Forces, who served during time of war, and who were residents of New York when they entered military service.[1] This preference may be exercised only once, either for original hiring or for one promotion.   N. Y. Const., Art. V, § 6.

Appellees, Eduardo Soto-Lopez and Eliezer Baez-Hernandez, are veterans of the United States Army and long-time residents of New York.   Both men claim to have met all the eligibility criteria for the New York State civil service preference except New York residence when they entered the Army.   Both Soto-Lopez and Baez-Hernandez

---

[1] New York Constitution, Art. V, § 6, provides:

"Appointments and promotions in the civil service of the state and of all the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, as far as practicable, by examination, which, as far as practicable, shall be competitive; provided, however, that any member of the armed forces of the United States who served therein in time of war, who is a citizen and resident of this state and was a resident at the time of his entrance into the armed forces of the United States and was honorably discharged or released under honorable circumstances from such service, shall be entitled to receive five points additional credit in a competitive examination for original appointment and two and one-half points additional credit in an examination for promotion or, if such member was disabled in the actual performance of duty in any war . . . he shall be entitled to receive ten points additional credit in a competitive examination for original appointment and five points additional credit in an examination for promotion. . . . No such member shall receive the additional credit granted by this section after he has received one appointment, either original entrance or promotion, from an eligible list on which he was allowed the additional credit granted by this section."

New York Civ. Serv. Law § 85 essentially restates the substance of the constitutional provision and defines the relevant terms.

passed New York City civil service examinations, but were denied the veterans' preference by the New York City Civil Service Commission because they were residents of Puerto Rico at the time they joined the military. Appellees sued the city in Federal District Court, alleging that the requirement of residence when they joined the military violated the Equal Protection Clause of the Fourteenth Amendment and the constitutionally protected right to travel. The Attorney General of the State of New York intervened as a defendant.

The District Court dismissed appellees' complaint, holding that this Court's summary affirmance in *August* v. *Bronstein*, 417 U. S. 901 (1974), aff'g 369 F. Supp. 190 (SDNY), a case in which a three-judge panel upheld against equal protection and right-to-travel challenges the same sections of the New York State Constitution and Civil Service Law at issue in the instant action, compelled that result. The Court of Appeals for the Second Circuit reversed. *Soto-Lopez* v. *New York City Civil Service Comm'n*, 755 F. 2d 266 (1985). It concluded that *August, supra*, had implicitly been overruled by our more recent decision in *Zobel* v. *Williams*, 457 U. S. 55 (1982), and held that the prior residence requirement of the New York civil service preference offends both the Equal Protection Clause and the right to travel. The Court of Appeals remanded with various instructions, including the direction that the District Court permanently enjoin the defendants from denying bonus points to otherwise qualified veterans who were not residents of New York at the time they entered the military service. We noted probable jurisdiction of this appeal of the Attorney General of New York. 473 U. S. 903 (1985). We affirm.

II

"'[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution.'" *Dunn* v. *Blumstein*, 405 U. S. 330, 338 (1972) (quoting *United States* v. *Guest*, 383 U. S. 745, 758 (1966)). See,

*e. g., Passenger Cases,* 7 How. 283, 492 (1849) (Taney, C. J., dissenting); *Crandall* v. *Nevada,* 6 Wall. 35, 43–44 (1868); *Paul* v. *Virginia,* 8 Wall. 168, 180 (1869); *Edwards* v. *California,* 314 U. S. 160 (1941); *Kent* v. *Dulles,* 357 U. S. 116, 126 (1958); *Shapiro* v. *Thompson,* 394 U. S. 618, 629–631, 634 (1969); *Oregon* v. *Mitchell,* 400 U. S. 112, 237 (1970) (separate opinion of BRENNAN, WHITE, and MARSHALL, JJ.); *id.,* at 285–286 (Stewart, J., concurring in part and dissenting in part, with whom BURGER, C. J., and BLACKMUN, J., joined); *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250, 254 (1974). And, it is clear that the freedom to travel includes the "'freedom to enter and abide in any State in the Union.'" *Dunn, supra,* at 338 (quoting *Mitchell, supra,* at 285).

The textual source of the constitutional right to travel, or, more precisely, the right of free interstate migration, though, has proved elusive. It has been variously assigned to the Privileges and Immunities Clause of Art. IV, see, *e. g., Zobel, supra,* at 71 (O'CONNOR, J., concurring in judgment), to the Commerce Clause, see *Edwards* v. *California,* 314 U. S., at 173–174, and to the Privileges and Immunities Clause of the Fourteenth Amendment, see, *e. g., id.,* at 177–178 (Douglas, J., concurring). The right has also been inferred from the federal structure of government adopted by our Constitution. *Zobel, supra,* at 67 (BRENNAN, J., concurring); *Shapiro, supra,* at 631; *United States* v. *Guest, supra,* at 757–758. However, in light of the unquestioned historic acceptance of the principle of free interstate migration, and of the important role that principle has played in transforming many States into a single Nation, we have not felt impelled to locate this right definitively in any particular constitutional provision.[2] *Shapiro, supra,* at 630.

---

[2] As was observed in *Zobel* v. *Williams,* 457 U. S. 55, 67 (1982) (BRENNAN, J., concurring):

"[It] is clear from our cases [that] the right to travel achieves its most forceful expression in the context of equal protection analysis. But if, finding no citable passage in the Constitution to assign as its source, some

Whatever its origin, the right to migrate is firmly established and has been repeatedly recognized by our cases. See, *e. g.*, *Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612, 618, n. 6 (1985); *Zobel, supra,* at 60, n. 6; *Jones* v. *Helms*, 452 U. S. 412, 418 (1981); *Memorial Hospital* v. *Maricopa County, supra; Dunn, supra; Shapiro, supra; United States* v. *Guest, supra,* at 757–759.

A state law implicates the right to travel when it actually deters such travel, see, *e. g.*, *Crandall* v. *Nevada, supra,* at 46; see also *Shapiro, supra,* at 629, when impeding travel is its primary objective, see *Zobel, supra,* at 62, n. 9; *Shapiro, supra,* at 628–631, or when it uses "'any classification which serves to penalize the exercise of that right.'" *Dunn, supra,* at 340 (quoting *Shapiro, supra,* at 634). Our right-to-migrate cases have principally involved the latter, indirect manner of burdening the right. More particularly, our recent cases have dealt with state laws that, by classifying residents according to the time they established residence, resulted in the unequal distribution of rights and benefits among otherwise qualified bona fide residents.[3] *Hooper,*

---

might be led to question the independent vitality of the principle of free interstate migration, I find its unmistakable essence in that document that transformed a loose confederation of States into one Nation."

[3] We have always carefully distinguished between bona fide residence requirements, which seek to differentiate between residents and nonresidents, and residence requirements, such as durational, fixed date, and fixed point residence requirements, which treat established residents differently based on the time they migrated into the State. See, *e. g.*, *Martinez* v. *Bynum*, 461 U. S. 321, 325–330 (1983); *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250, 255, 267 (1974); *Dunn* v. *Blumstein*, 405 U. S. 330, 343 (1972); *Shapiro* v. *Thompson*, 394 U. S. 618, 636, 638, n. 21 (1969). As we explained in *Martinez:*

"A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents. Such a requirement . . . [generally] does not burden or penalize the constitutional right of interstate travel, for any person is free to move to a State and to establish residence there. A bona fide residence requirement simply requires that

*supra; Zobel* v. *Williams,* 457 U. S. 55 (1982); *Sosna* v. *Iowa,* 419 U. S. 393 (1975); *Memorial Hospital, supra; Dunn* v. *Blumstein,* 405 U. S. 330 (1972); *Shapiro, supra.*

Because the creation of different classes of residents raises equal protection concerns, we have also relied upon the Equal Protection Clause in these cases. Whenever a state law infringes a constitutionally protected right, we undertake intensified equal protection scrutiny of that law. See, *e. g., Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 440 (1985); *Martinez* v. *Bynum,* 461 U. S. 321, 328, n. 7 (1983); *Plyler* v. *Doe,* 457 U. S. 202, 216–217, and n. 15 (1982); *Memorial Hospital, supra,* at 258, 262; *San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1, 16, and n. 39, 30–32, 40 (1973); *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 101 (1972); *Dunn, supra,* at 335, 342; *Shapiro, supra,* at 634. Thus, in several cases, we asked expressly whether the distinction drawn by the State between older and newer residents burdens the right to migrate. Where we found such a burden, we required the State to come forward with a compelling justification. See, *e. g., Shapiro* v. *Thompson, supra; Dunn, supra; Memorial Hospital* v. *Maricopa County,* 415 U. S. 250 (1974). In other cases, where we concluded that the contested classifications did not survive even rational-basis scrutiny, we had no occasion to inquire whether enhanced scrutiny was appropriate. *Hooper, supra; Zobel, supra.* The analysis in all of these cases, however, is informed by the same guiding principle—the right to migrate protects residents of a State from being disadvantaged, or from being treated differently, simply because of the timing of their migration, from other similarly situated residents.[4] *Hooper,*

---

the person *does* establish residence before demanding the services that are restricted to residents." 461 U. S., at 328–329.

[4] Of course, regardless of the label we place on our analysis—right to migrate or equal protection—once we find a burden on the right to migrate the standard of review is the same. Laws which burden that right must

*supra,* at 618, n. 6; *Zobel, supra,* at 60, n. 6; *Memorial Hospital, supra,* at 261; *Shapiro, supra,* at 629–631.

New York's eligibility requirements for its civil service preference conditions a benefit on New York residence at a particular past time in an individual's life. It favors those veterans who were New York residents at a past fixed point over those who were not New York residents at the same point in their lives. Our cases have established that similar methods of favoring "prior" residents over "newer" ones, such as limiting a benefit to those who resided in the State by a fixed past date, *Hooper, supra;* granting incrementally greater benefits for each year of residence, *Zobel, supra;* and conditioning eligibility for certain benefits on completion of a fixed period of residence, see, *e. g., Memorial Hospital, supra; Dunn* v. *Blumstein, supra; Shapiro, supra,* warrant careful judicial review.[5] But, our cases have also established that only where a State's law "'operates to penalize those persons . . . who have exercised their constitutional right of interstate migration'" is heightened scrutiny triggered. *Memorial Hospital, supra,* at 258, quoting *Oregon*

---

be necessary to further a compelling state interest. See, *e. g., Memorial Hospital, supra; Dunn, supra; Shapiro, supra.*

[5] We have cautioned, however, that not all waiting periods are impermissible. See, *e. g., Memorial Hospital, supra,* at 258–259; *Shapiro, supra,* at 638, n. 21. Indeed, in *Sosna* v. *Iowa,* 419 U. S. 393 (1975), we upheld a 1-year residency condition for maintaining an action for divorce. We noted the State's strong, traditional interest in setting the terms of and procedures for marriage and divorce. Weighing the fact that appellant's access to the desired state procedure was only temporarily delayed, against the State's important interest, we concluded that her right to migrate was not violated.

We have also sustained domicile requirements, which incorporated 1-year waiting periods, for resident tuition at state universities. *Starns* v. *Malkerson,* 401 U. S. 985 (1971), summarily aff'g 326 F. Supp. 234 (Minn. 1970) (three-judge court); *Sturgis* v. *Washington,* 414 U. S. 1057 (1973), summarily aff'g 368 F. Supp. 38 (WD Wash.) (three-judge court). See also *Vlandis* v. *Kline,* 412 U. S. 441, 452–454 (1973).

v. *Mitchell*, 400 U. S., at 238 (separate opinion of BRENNAN, WHITE, and MARSHALL, JJ.).

Our task in this case, then, is first to determine whether New York's restriction of its civil service preference to veterans who entered the Armed Forces while residing in New York operates to penalize those persons who have exercised their right to migrate. If we find that it does, appellees must prevail unless New York can demonstrate that its classification is necessary to accomplish a compelling state interest. *Memorial Hospital, supra*, at 262; *Dunn, supra*, at 342; *Shapiro*, 394 U. S., at 634.[6]

---

[6] In his concurrence, THE CHIEF JUSTICE takes us to task for asking in the first instance what is the appropriate standard of review to employ in evaluating New York's laws. THE CHIEF JUSTICE argues that we should initially run the laws through a rational-basis analysis and then, if they survive that level of scrutiny, ask whether a higher level is appropriate.

We disagree. The logical first question to ask when presented with an equal protection claim, and the one we usually ask first, is what level of review is appropriate. See, *e. g.*, *Dunn*, 405 U. S., at 335 ("In considering laws challenged under the Equal Protection Clause . . . [f]irst . . . we must determine what standard of review is appropriate"). See also, *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432 (1985); *Mississippi University for Women* v. *Hogan*, 458 U. S. 718 (1982); *Plyler* v. *Doe*, 457 U. S. 202 (1982); *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250 (1974); *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1 (1973); *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92 (1972); *Shapiro* v. *Thompson*, 394 U. S. 618 (1969). It is well established that where a law classifies by race, alienage, or national origin, and where a law classifies in such a way as to infringe constitutionally protected fundamental rights, heightened scrutiny under the Equal Protection Clause is required. See, *e. g.*, *Cleburne, supra*, at 440; *Martinez*, 461 U. S., at 328, n. 7; *Plyler* v. *Doe, supra*, at 216–217, and n. 15; *Memorial Hospital, supra*, at 258, 262; *San Antonio Independent School District, supra*, at 16, and nn. 39, 30–32, 40; *Mosley, supra*, at 101; *Dunn, supra*, at 335, 342; *Shapiro, supra*, at 634. In the instant case, appellees contend not only that the laws in question treat them differently from another class of state residents, they also maintain that by treating them differently, the laws burden their constitutionally protected right to travel. Therefore, in order to ascertain the ap-

## III

### A

In previous cases, we have held that even temporary deprivations of very important benefits and rights can operate to penalize migration. For example, in *Shapiro* and in *Memorial Hospital*, we found that recently arrived indigent residents were deprived of life's necessities by durational residence requirements for welfare assistance and for free, non-emergency medical care, respectively, which were available to other poor residents. In *Dunn*, we held that new residents were denied a basic right by a durational residence requirement for establishing eligibility to vote. The fact that these deprivations were temporary did not offset the Court's conclusions that they were so severe and worked such serious inequities among otherwise qualified residents that they effectively penalized new residents for the exercise of their rights to migrate.

More recently, in *Hooper* v. *Bernalillo*, 472 U. S. 612 (1985), and *Zobel* v. *Williams*, 457 U. S. 55 (1982), we struck down state laws that created permanent distinctions among residents based on the length or timing of their residence in the State. At issue in *Hooper* was a New Mexico statute that granted a tax exemption to Vietnam veterans who resided in the State before May 8, 1976. *Zobel* concerned an Alaska statute granting residents one state mineral income dividend unit for each year of residence subsequent to 1959. Because we employed rational-basis equal protection analysis in those cases, we did not face directly the question whether

---

propriate level of scrutiny, we must, as an initial matter, determine whether or not the State's laws actually burden appellees' right to travel.

It is true, as THE CHIEF JUSTICE suggests, that in *Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612 (1985), and *Zobel* v. *Williams*, 457 U. S. 55 (1982), the Court did not follow this same logical sequence of analysis. We think that the better approach is that which the Court has employed in other equal protection cases—to inquire first as to the proper level of scrutiny and then to apply it.

the contested laws operated to penalize interstate migration. Nonetheless, the conclusion that they did penalize migration may be inferred from our determination that "the Constitution will not tolerate a state benefit program that 'creates fixed, permanent distinctions . . . between . . . classes of concededly bona fide residents, based on how long they have been in the State.'" *Hooper, supra,* at 623 (quoting *Zobel, supra,* at 59). See also *Zobel, supra,* at 64.

Soto-Lopez and Baez-Hernandez have been denied a significant benefit that is granted to all veterans similarly situated except for State of residence at the time of their entry into the military. While the benefit sought here may not rise to the same level of importance as the necessities of life and the right to vote, it is unquestionably substantial. The award of bonus points can mean the difference between winning or losing civil service employment, with its attendant job security, decent pay, and good benefits.[7] Brief for Appellees 27–28. See also *Guardians Assn. of New York City*

_____

[7] In *Andrade v. Nadel,* 477 F. Supp. 1275, 1279 (SDNY 1979), the Deputy Director of the New York City Department of Personnel testified:

"[O]n most civil service examinations, there is a pronounced 'bunching' (*i. e.,* a large percentage of the test takers obtain very similar scores). [I]t can be assumed that rescission of the five or 10 point veterans' preference in the case of most of 1,300 employee [veterans receiving probationary appointments in New York City in a specific year would] result in their receiving a list number that has not yet been reached for appointment, and . . . consequently [in their losing] their jobs."

Appellees contend that this "bunching" phenomenon adversely affected their employment opportunities with the City of New York. For example, after passing a New York City civil service examination, Baez-Hernandez was preliminarily awarded 10 veterans' bonus points—5 for veteran status, and 5 for his service-related disability, bringing his total score to 87.3. Based on this adjusted score, he received an appointment with the city in June 1981. The award of the 10 bonus points was rescinded two days later, however, and the appointment withdrawn when it was discovered that Baez-Hernandez was not a New York resident at the time of his entry into the Army. *Soto-Lopez v. New York City Civil Service Comm'n,* 755 F. 2d 266, 268–269 (CA2 1985).

*Police Dept., Inc.* v. *Civil Service Comm'n*, 630 F. 2d 79, 85 (CA2 1980), cert. denied, 452 U. S. 940 (1981); *Andrade* v. *Nadel*, 477 F. Supp. 1275, 1279 (SDNY 1979). Furthermore, appellees have been *permanently* deprived of the veterans' credits that they seek. As the Court of Appeals observed: "The veteran's ability to satisfy the New York residence requirement is . . . fixed. He either was a New York resident at the time of his initial induction or he was not; he cannot earn a change in status." 755 F. 2d, at 275. Such a permanent deprivation of a significant benefit, based only on the fact of nonresidence at a past point in time, clearly operates to penalize appellees for exercising their rights to migrate.

B

New York offers four interests in justification of its fixed point residence requirement: (1) the encouragement of New York residents to join the Armed Services; (2) the compensation of residents for service in time of war by helping these veterans reestablish themselves upon coming home; (3) the inducement of veterans to return to New York after wartime service; and (4) the employment of a "uniquely valuable class of public servants" who possess useful experience acquired through their military service. Brief for Appellant 15. All four justifications fail to withstand heightened scrutiny on a common ground—each of the State's asserted interests could be promoted fully by granting bonus points to *all* otherwise qualified veterans. New York residents would still be encouraged to join the services. Veterans who served in time of war would be compensated. And, both former New Yorkers and prior residents of other States would be drawn to New York after serving the Nation, thus providing the State with an even larger pool of potentially valuable public servants.

As we held in *Dunn:* "[I]f there are other, reasonable ways to achieve [a compelling state purpose] with a lesser burden on constitutionally protected activity, a State may not choose

the way of greater interference. If it acts at all, it must choose 'less drastic means.'" 405 U. S., at 343 (quoting *Shelton* v. *Tucker*, 364 U. S. 479, 488 (1960)). See also *Memorial Hospital*, 415 U. S., at 263. Because New York could accomplish its purposes without penalizing the right to migrate by awarding special credits to all qualified veterans, the State is not free to promote its interests through a preference system that incorporates a prior residence requirement.

Two of New York's asserted interests have additional weaknesses. First, the availability of the preference to *inductees* as well as *enlistees* undercuts the State's contention that one of the most important purposes of the veterans' credit is to encourage residents to *enlist* in the services. Second, the fact that eligibility for bonus points is not limited to the period immediately following a veteran's return from war casts doubt on New York's asserted purpose of easing the transition from wartime military conditions to civilian life,[8] for, presumably, a veteran of the Korean War could take a civil service examination and receive the bonus points tomorrow, 30 years after his homecoming. Cf. *Hooper*, 472 U. S., at 621. The State's failure to limit the credit to enlistees recently returned to New York from war strongly suggests that the State's principal interest is simply in rewarding its residents for service to their country.

Compensating veterans for their past sacrifices by providing them with advantages over nonveteran citizens is a longstanding policy of our Federal and State Governments. See, *e. g., Hooper, supra; Regan* v. *Taxation with Representation of Washington*, 461 U. S. 540, 551 (1983); *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S. 256, 279, n. 25

---

[8] Moreover, it is difficult to understand why veterans who joined the military as New York residents would have so much more trouble effecting this transition than other veterans that New York is justified in reserving "the benefits [it] bestows for national military service" for only one class of resident veterans. *Hooper* v. *Bernalillo County Assessor*, 472 U. S., at 621.

(1979). Nonetheless, this policy, even if deemed compelling, does not support a distinction between resident veterans based on their residence when they joined the military. Members of the Armed Forces serve the Nation as a whole. While a serviceperson's home State doubtlessly derives indirect benefit from his or her service, the State benefits equally from the contributions to our national security made by other service personnel. "Permissible discriminations between persons" must be correlated to "their *relevant* characteristics." *Zobel*, 457 U. S., at 70 (BRENNAN, J., concurring). Because prior residence has only a tenuous relation, if any, to the benefit New York receives from all Armed Forces personnel, the goal of rewarding military service offers no support for New York's fixed point residence requirement.

## IV

In sum, the provisions of New York's Constitution, Art. V, § 6, and Civil Service Law § 85, which limit the award of a civil service employment preference to resident veterans who lived in New York at the time they entered the Armed Forces, effectively penalize otherwise qualified resident veterans who do not meet the prior residence requirement for their exercise of the right to migrate. The State has not met its heavy burden of proving that it has selected a means of pursuing a compelling state interest which does not impinge unnecessarily on constitutionally protected interests. Consequently, we conclude that New York's veterans' preference violates appellees' constitutionally protected rights to migrate and to equal protection of the law.

Once veterans establish bona fide residence in a State, they "become the State's 'own' and may not be discriminated against solely on the basis of [the date of] their arrival in the State." *Hooper, supra,* at 623. See also *Vlandis* v. *Kline*, 412 U. S. 441, 449–450, and n. 6 (1973); *Shapiro,* 394 U. S., at 632–633; *Passenger Cases,* 7 How., at 492 (Taney, C. J., dissenting). For as long as New York chooses to offer its

resident veterans a civil service employment preference, the Constitution requires that it do so without regard to residence at the time of entry into the services.[9]  Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

CHIEF JUSTICE BURGER, concurring in the judgment.

In this case the Court of Appeals held that New York's civil service veterans' preference violated both equal protection and the right to travel, relying on *Zobel* v. *Williams,* 457 U. S. 55 (1982).  Shortly after the Court of Appeals' decision was issued, we struck down New Mexico's property tax veterans' preference in *Hooper* v. *Bernalillo County Assessor,* 472 U. S. 612 (1985).  Both *Zobel* and *Hooper* held that the classifications used by the States to award preferences to certain citizens failed to pass a rational-basis test *under the Equal Protection Clause.*  As a result, we had no occasion to reach the issues whether the classifications would survive heightened scrutiny or whether the right to travel was violated.  See *Hooper, supra,* at 618, and n. 6; *Zobel, supra,* at 60–61, and n. 6.

The classification held invalid on equal protection grounds in *Hooper* was remarkably similar to the one at issue here; *Hooper,* therefore, would appear to be controlling.  The plurality opinion, however, instead *begins* the analysis by addressing the "right to migrate."  *Ante,* at 901–905.  Moreover, heightened scrutiny is employed without first determining whether the challenged New York classification would survive even rational-basis analysis.  *Ante,* at 907–909.  But as we observed in *Zobel, supra,* at 60, n. 6, and reiterated only last Term in *Hooper, supra,* at 618, n. 6, "[r]ight to travel cases have examined, in equal protection terms, state distinctions between newcomers and longer term residents."  This follows because "[i]n reality, right to

---

[9] Our summary affirmance in *August* v. *Bronstein,* 417 U. S. 901 (1974), is hereby overruled.

travel analysis refers to little more than a particular application of equal protection analysis." *Zobel, supra,* at 60, n. 6.

I believe the appropriate framework for reviewing New York's preference scheme is the one dictated by *Zobel* and followed in *Hooper*—both very recent cases. Because "[t]his case involves a distinction between residents based on when they first established residence in the State," just as in *Hooper,* "we [must] subject this case to equal protection analysis." *Hooper,* 472 U. S., at 618, n. 6. The first question is whether the law survives rational-basis analysis under the Equal Protection Clause. "[I]f the statutory scheme cannot pass even the minimum rationality test, our inquiry ends." *Id.,* at 618. Under *Hooper,* it seems clear that New York's provision is invalid on equal protection grounds.

The State proffers four justifications for the challenged classification. First, it claims that the preference system encourages New York residents to enlist during times of war. This justification rests entirely on the State's characterization of the preference as being *prospective* and self-executing in nature. But plainly the preference is granted only *retrospectively* following definitive action by the legislature; legislative action is necessary to fix both the period when "war" is deemed to have commenced and when that war has ended.

In many cases a New York resident entering military service will have no idea whether he or she will be entitled to the preference following a successful tour of duty and honorable discharge. For example, the beginning of the Vietnam era was established by legislation as a "time of war" some three years *after* hostilities commenced. The legislature in 1973 later declared the "end" of that "war" (which was never declared a "war" by Congress) for purposes of the preference as March 29, 1973, but in 1983 it amended that finding to expand coverage retroactively again until May 7, 1975. See Brief for Appellant 9–10. The same happened in the Korean Con-

flict, and indeed, the provision at issue was adopted after the end of World War II with the clear intent to grant the benefit retroactively to veterans of that war. *Id.*, at 7–8.

Moreover, the preference applies to *all* servicemen entering the military during the legislatively defined period, regardless of whether they enlisted voluntarily or were inducted as a result of the draft. Providing a "bonus" to draftees is hardly a boon intended or necessary to "encourage" them to enlist. Hence, this "encouragement to enlist" sharply "differs from the local 'bounty' laws enacted during the Civil War era, through which States paid residents cash bonuses for enlisting." *Hooper*, 472 U. S., at 622, n. 12.

Second, the State argues that the preference provides partial compensation to residents for service during time of war. But our holding in *Hooper* clearly rejected any such retroactive rewards targeting only past residents. While we acknowledged that a "State may award certain benefits to all its bona fide veterans," *id.*, at 620, just as in that case "it is difficult to grasp how [New York] residents serving in the military suffered more than residents of other States who served, so that the latter would not deserve the benefits a State bestows for national military service." *Id.*, at 621.

Third, the State contends that it is permissible to encourage past-resident veterans to settle in New York after their military service ends. While such a preference might indeed encourage such veterans to return, it simultaneously has the effect of *discouraging* other veterans from settling in New York who are aware that civil service appointments will be hard to obtain. As we observed in *Zobel* and reiterated in *Hooper, supra,* at 619–620, "[t]he separation of residents into classes hardly seems a likely way to persuade new [residents] that the State welcomes them and wants them to stay." *Zobel, supra,* at 62, n. 9. Moreover, *Hooper* made it clear that a "selective incentive" such as New York provides here "would encounter the same constitutional barrier faced

by the [New Mexico] statute's distinction between past and newly arrived residents." *Hooper, supra,* at 619, n. 8.

Finally, the State asserts that the preference is targeted at a very special group of veterans who have both knowledge of local affairs and valuable skills learned in the military, and who therefore would make exceptional civil servants. But these "special attributes" are undeniably possessed by *all* veterans who are currently residents of New York.

Indeed, the irrationality of the New York scheme is highlighted by appellee Baez-Hernandez' experiences. The current provision would grant a civil service hiring preference to a serviceman entering the military while a resident of New York even if he was a resident only for a day. But Baez-Hernandez, who was a resident of New York for over 10 years before applying for a civil service position—and who therefore has considerably more "local knowledge" than many returning veterans—can never receive the preference. Moreover, Baez-Hernandez was a resident of New York for two years when he was called from reserve status to active duty, where he remained until he was discharged as partially disabled. He therefore served "in time of war" *after* obtaining New York residency. Yet he still cannot qualify despite his being endowed with all the desired "special attributes."

Just as in *Hooper,* "[s]tripped of its asserted justifications, the [New York] statute suffers from the same constitutional flaw as the Alaska statute in *Zobel.*" 472 U. S., at 622. Given our reasons for granting review, our admonition in *Hooper* need only be reiterated briefly to demonstrate the invalidity of the New York scheme under equal protection, rational-basis analysis:

> "The State may not favor established residents over new residents based on the view that the State may take care of 'its own,' if such is defined by prior residence. Newcomers, by establishing bona fide residence in the State, become the State's 'own' and may not be discriminated

against solely on the basis of their arrival in the State after [a fixed date]." *Id.*, at 623.

Appellees Soto-Lopez and Baez-Hernandez, by establishing bona fide residence in New York, have become the State's "own" and must be treated accordingly with regard to any veterans' preference. "Neither the Equal Protection Clause, nor this Court's precedents, permit the State to prefer established resident veterans over newcomers in the retroactive apportionment of an economic benefit." *Ibid.*

I would affirm the judgment of the Court of Appeals based on our reasoning and holdings in *Hooper* and *Zobel*, rather than adding dicta concerning the right to travel.

JUSTICE WHITE, concurring in the judgment.

I agree with JUSTICE O'CONNOR that the right to travel is not sufficiently implicated in this case to require heightened scrutiny. Hence, I differ with JUSTICE BRENNAN in this respect. But I agree with THE CHIEF JUSTICE that the New York statute at issue denies equal protection of the laws because the classification it employs is irrational. I therefore concur in the judgment.

JUSTICE STEVENS, dissenting.

JUSTICE O'CONNOR has explained why the Court's decision is erroneous. I add these comments to explain why I do not feel constrained by the decision in *Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612 (1985), to join the Court's judgment.

A governmental decision to grant a special privilege to a minority group is less objectionable than a decision to impose a special burden on a minority.[1] In a democracy the majority will seldom treat itself unfairly. In equal protection anal-

---

[1] Cf. *Wygant* v. *Jackson Board of Education, ante,* at 316–317 (STEVENS, J., dissenting).

ysis, it is therefore appropriate to give some attention to the relative dimensions of favored and disfavored classes.[2]

The New Mexico statute that the Court held invalid in *Hooper* gave a tax exemption to any Vietnam veteran who resided in New Mexico prior to May 8, 1976. The New York statute challenged in this case grants a preference only to those Vietnam veterans who were residents of the State when they joined the Armed Forces. The favored class in this case is therefore drawn more narrowly than the class that excluded Mr. Hooper. Despite the fact that the reasoning of the *Hooper* opinion might seem to cover this case as well, this distinction allows me to conclude otherwise for two reasons.

First, in its *Hooper* opinion the Court itself was careful to reserve the question of the constitutionality of the New York statute in particular, and of the class of statutes that condition eligibility for a veteran's preference on residence at the time of enlistment in general.[3] If the Court believed the reasoning of *Hooper* to be controlling in this case, it had only to omit its footnote in *Hooper* and to affirm rather than note jurisdiction in this case, as it subsequently did. The Court cannot both leave a question open in order to make its *Hooper*

---

[2] See *Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612, 629–630 (1985) (STEVENS, J., dissenting); *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S. 256, 281 (1979) (STEVENS, J., concurring). Cf. *Craig* v. *Boren*, 429 U. S. 190, 213–214 (1976) (STEVENS, J., concurring).

[3] "Veterans' benefit statutes, which condition eligibility on state residence at the time of induction into the military, have survived challenges under the Equal Protection Clause before *Zobel* was decided. See, *e. g.*, . . . *August* v. *Bronstein*, 369 F. Supp. 190 (SDNY), summarily aff'd, 417 U. S. 901 (1974) . . . .

". . . [We note that] the Second Circuit recently has ruled that such a statute could not pass muster under the Equal Protection Clause in light of the Court's holding in *Zobel* [v. *Williams*, 457 U. S. 55 (1982)]. *Soto-Lopez* v. *New York City Civil Service Comm'n*, 755 F. 2d 266 (1985), appeal docketed, No. 84–1803. Given the circumstances presented in this case, we need not consider here the constitutionality of these statutes." *Hooper* v. *Bernalillo County Assessor*, 472 U. S., at 621–622, n. 11.

decision acceptable to a majority of its Members and at the same time claim that the *Hooper* holding has resolved the open question.

Second, and of greater importance, each additional condition of eligibility that further narrows the size of the preferred class places greater stress on the logic that undergirds the Court's holding. If a State should grant a special bonus to fighter pilots who are residents at the time of enlistment, to those who fought in the Battle of Midway, or perhaps just to the few who received the Congressional Medal of Honor— would it violate the Equal Protection Clause to deny bonuses to comparable veterans who moved into the State after the end of the war? I think not, even though the reasoning in the opinions supporting the judgment would apply to each of those cases as well as it does to *Hooper* and to this case. As the class narrows, a judge is surely not bound to apply that flawed reasoning in each successive case instead of using each new extension to explain why the Court is marching in the wrong direction.

I respectfully dissent.

JUSTICE O'CONNOR, with whom JUSTICE REHNQUIST and JUSTICE STEVENS join, dissenting.

The Court today holds unconstitutional the preference in public employment opportunities New York offers to resident wartime veterans who resided in New York when they entered military service. Because I believe that New York's veterans' preference scheme is not constitutionally offensive under the Equal Protection Clause, does not penalize some free-floating "right to migrate," and does not violate the Privileges and Immunities Clause of Art. IV, §2, of the Constitution, I dissent.

I

The plurality's constitutional analysis runs generally as follows: because the classification imposed by New York's limited, one-time veterans' civil service preference "penalizes" appellees' constitutional "right to migrate," the preference

program must be subjected to heightened scrutiny, which it does not survive because it is insufficiently narrowly tailored to serve its asserted purposes. On the strength of this reasoning, the plurality concludes that the preference program violates both appellees' constitutional "right to migrate" and their right to equal protection of the law, see *ante*, at 911, although it does not make clear how much of its analysis is necessary or sufficient to find a violation of the "right to migrate" independently of an Equal Protection Clause violation.

In pursuing this new dual analysis, the plurality simply rejects the equal protection approach the Court has previously employed in similar cases, see, *e. g., Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612 (1985), without bothering to explain why its novel use of both "right to migrate" analysis and strict equal protection scrutiny is more appropriate, necessary or doctrinally coherent. Cf. *Jones* v. *Helms*, 452 U. S. 412, 426–427 (1981) (WHITE, J., concurring). Indeed, the plurality does not even feel "impelled to locate ['the right to migrate'] definitively in any particular constitutional provision," despite the fact that its ruling rests in major part on its determination that the preference scheme penalizes that right. See *ante*, at 902, 907–911, and n. 4. The plurality's refusal to amplify its opinion further is even more remarkable given that the Court is overturning the very provisions of New York's Constitution and its Civil Service Law which it upheld against the same challenges just 12 years ago. See *August* v. *Bronstein*, 369 F. Supp. 190 (SDNY), summarily aff'd, 417 U. S. 901 (1974).

THE CHIEF JUSTICE finds it unnecessary to address the proper analytical role of the "right to travel" in this case because he believes that the New York scheme cannot survive rational basis scrutiny purely as a matter of equal protection law. See *ante*, at 913, 916. Yet THE CHIEF JUSTICE's position depends in part on the assumption that New York's desire "to reward citizens for past contributions . . . is not a legitimate state purpose," *Zobel* v. *Williams*, 457 U. S. 55, 63 (1982). See *ante*, at 914. This assumption is not re-

quired by anything in the Equal Protection Clause; rather, "a full reading of *Shapiro* v. *Thompson,* 394 U. S. 618 (1969), and *Vlandis* v. *Kline,* 412 U. S. 441 (1973), reveals [that] the Court has rejected this objective only when its implementation would abridge an interest in interstate travel or migration." *Zobel* v. *Williams, supra,* at 72 (O'CONNOR, J., concurring in judgment).

It is unfortunate that the Court has once again failed to articulate and justify by reference to textual sources a single constitutional principle or analysis upon which it can rely in deciding cases such as this. I adhere to my belief that the Privileges and Immunities Clause of Art. IV, § 2, of the Constitution supplies the relevant basis for analysis in evaluating claims like appellees', where the principal allegation is that the state scheme impermissibly distinguishes between state residents, allegedly imposing a relative burden on those who have more recently exercised their right to establish residence in the State. See *Zobel* v. *Williams,* 457 U. S., at 74–75 (O'CONNOR, J., concurring in judgment). I also continue to believe that a State's desire to compensate its citizens for their prior contributions is "neither inherently invidious nor irrational," either under the Court's "right to migrate" or under some undefined, substantive component of the Equal Protection Clause. *Id.,* at 72. This case presents one of those instances in which the recognition of state citizens' past sacrifices constitutes a valid state interest that does not infringe any constitutionally protected interest, including the fundamental right to settle in another State which is protected by the Privileges and Immunities Clause of Art. IV, § 2. See *id.,* at 72, n. 1.

## II

In my view, the New York veterans' preference scheme weathers constitutional scrutiny under any of the theories propounded by the Court. The plurality acknowledges that heightened scrutiny is appropriate only if the statutory classification "penalize[s]," "actually deters," or is primarily

intended to "imped[e]" the exercise of the right to travel. See *ante,* at 903. In finding that the New York preference program imposes a "penalty" on appellees' right to migrate, the plurality likens the New York scheme to the permanent state property tax exemption for veterans struck down in *Hooper* v. *Bernalillo County Assessor, supra,* and the durational residency requirements for essential governmental services invalidated in *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250 (1974), and *Shapiro* v. *Thompson, supra.*

This Court in *Memorial Hospital* acknowledged that *Shapiro* left unclear the amount of impact on the right to travel which is necessary to give rise to application of heightened scrutiny. See *Memorial Hospital* v. *Maricopa County, supra,* at 256–259. As the plurality implicitly recognizes, see *ante,* at 907–909, it is fair to infer that something more than a negligible or minimal impact on the right to travel is required before strict scrutiny is applied. I believe that, as the three-judge panel in *August* v. *Bronstein* put it, "the limited preference granted under the . . . New York law can[not] realistically be held to infringe or penalize the right to travel." 369 F. Supp., at 194.

The New York law certainly does not directly restrict or burden appellees' freedom to move to New York and to establish residence there by imposing discriminatory fees, taxes, or other direct restraints. Cf. *The Passenger Cases,* 7 How. 283 (1849). The New York preference program does not permanently deprive appellees of the right to participate in some fundamental or even "significant" activity, for "public employment is not a constitutional right . . . and the States have wide discretion in framing employee qualifications." *Personnel Administrator of Massachusetts* v. *Feeney,* 442 U. S. 256, 273 (1979). See also *Sosna* v. *Iowa,* 419 U. S. 393, 406 (1975). Cf. *Dunn* v. *Blumstein,* 405 U. S. 330, 336–337, 341 (1972). Nor does the program indirectly penalize migration by depriving the newcomers of fundamental rights or essential governmental services until they have re-

sided in the State for a set period of time. Cf. *Memorial Hospital* v. *Maricopa County, supra; Dunn* v. *Blumstein, supra; Shapiro* v. *Thompson, supra.*

Finally, the New York scheme does not effectively penalize those who exercise their fundamental right to settle in the State of their choice by requiring newcomers to accept a status inferior to that of all oldtime residents of New York upon their arrival. Cf. *Zobel* v. *Williams, supra,* at 74 (O'CONNOR, J., concurring in judgment). Those veterans who were not New York residents when they joined the United States Armed Forces, who subsequently move to New York, and who endeavor to secure civil service employment are treated exactly the same as the vast majority of New York citizens; they are in no sense regarded as "second-class citizens" when compared with the vast majority of New Yorkers or even the majority of the candidates against whom they must compete in obtaining civil employment. Cf. *Hicklin* v. *Orbeck,* 437 U. S. 518 (1978). To the extent that persons such as appellees labor under any practical disability, it is a disability that they share in equal measure with countless other New York residents, including New York residents who joined the Armed Forces from New York but are ineligible for the veterans' preference for other reasons.

The only persons who arguably have an advantage based on their prior residency in New York in relation to persons in appellees' position are a discrete group of veterans who joined the Armed Forces while New York residents, who served during wartime, who returned to New York, and who elected to seek public employment. Even that group does not enjoy an unqualified advantage over appellees based on their prior residence. New York's veterans' preference scheme requires that veterans satisfy a number of preconditions, of which prior residency is only one, before they qualify for the preference. Moreover, the preference only increases the possibility of securing a civil service appointment; it does not guarantee it. Those newly arrived veterans who

achieve a sufficiently high score on the exam may not be disadvantaged at all by the preference program; conversely, the chances of those who receive a very low score may not be affected by the fact that their competitors received bonus points. Finally, the bonus program is a one-time benefit. Veterans who join the service in New York, who satisfy the other statutory requirements, and who achieve a sufficiently high score on the exam to bring them within range of securing employment may only use the bonus points on one examination for appointment and in one job for promotion. Thus, persons such as appellees are not forced to labor under a "continuous disability" by comparison even to this discrete group of New York citizens. *Zobel* v. *Williams,* 457 U. S., at 75 (O'CONNOR, J., concurring in judgment).

Certainly the New York veterans' preference program imposes a less direct burden on a less "significant" interest than many resident-preference programs that this Court has upheld without difficulty. For example, this Court has summarily affirmed certain state residency requirements for state college tuition rates, *Sturgis* v. *Washington,* 414 U. S. 1057 (1973), and a limited eligibility statute in New York for scholarship assistance, *Spatt* v. *New York,* 414 U. S. 1058 (1973), even though those requirements constituted a potentially prohibitive burden on access to "important" educational opportunities. *San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1, 31–32 (1973). The Court has also upheld a 1-year durational residence requirement for eligibility to obtain a divorce in state courts, *Sosna* v. *Iowa, supra,* even though the right to terminate a marriage has been deemed in some sense "fundamental." See *Boddie* v. *Connecticut,* 401 U. S. 371 (1971).

In sum, finding that this scheme in theory or practical effect constitutes a "penalty" on appellees' fundamental right to settle in New York or on their "right to migrate" seems to me ephemeral, and completely unnecessary to safeguard the constitutional purpose of "maintaining a Union rather than a

mere 'league of States.'" *Zobel* v. *Williams, supra,* at 73 (O'CONNOR, J., concurring in judgment). See also *ante,* at 902 ("right to migrate" plays role of "transforming many States into a single Nation"). Thus, heightened scrutiny, either under the "right to migrate" or the Equal Protection Clause, see *ante,* at 904–905, n. 4, is inappropriate.

Under rational basis review, New York's program plainly passes constitutional muster. New York contends that its veterans' employment preference serves as an expression of gratitude to veterans who entered the service as New York residents. Even the plurality acknowledges the legitimacy of this state purpose. See *ante,* at 910. Indeed, it is difficult to impeach this interest, for "[o]ur country has a long-standing policy of compensating veterans for their past contributions by providing them with numerous advantages." *Regan* v. *Taxation with Representation of Washington,* 461 U. S. 540, 551 (1983). See also *Personnel Administrator of Massachusetts* v. *Feeney,* 442 U. S., at 261. As JUSTICE STEVENS has explained, "the simple interest in expressing the majority's gratitude for services that often entail hardship, hazard, and separation from family and friends, and that may be vital to the continued security of our Nation, is itself an adequate justification for providing veterans with a tangible token of appreciation." *Hooper* v. *Bernalillo County Assessor,* 472 U. S., at 626 (dissenting). In sum, this state interest could hardly be deemed inherently invidious or irrational. Nor, as demonstrated by the above discussion, could it be said to be constitutionally offensive because its implementation has burdened a fundamental right to travel.

I have difficulty believing that the veterans' preference scheme employed by New York does not rationally relate to this legitimate state interest. I had certainly thought a State could award a medal to all New York veterans of designated wars, or that it could erect memorials in honor of certain residents returning from particular armed conflicts; it is

hardly irrational to employ a means which gives certain returning wartime veterans a more tangible and useful expression of gratitude by way of employment preferences. I also find it hard to credit the idea that the Equal Protection Clause requires New York to reward the sacrifices of all those who joined the Armed Forces from other States and came to reside in New York if it wishes to reward the service of those who represented New York in the Armed Forces. Certainly those veterans who represented other States in the military aided New York by aiding the Nation, and suffered in equal measure with New York veterans, but that is not the issue. New York is not expressing gratitude for the prior resident's service to, and sacrifice for, the Nation as much as it is attempting to say "thank you" to those who personified New York's sacrifice and effort to "do its part" in supporting this Nation's war efforts. The prior residence of the individual seeking the statutory benefit clearly is a "relevant characteristic" to this legitimate and longstanding state interest and is one which has a manifest relation to the furtherance of that interest.

Whether this issue is tested under the "right to migrate," the Equal Protection Clause, or the Privileges and Immunities Clause of Art. IV, § 2, something more than the minimal effect on the right to travel or migrate that exists in this case must be required to trigger heightened scrutiny or the plurality's right to travel analysis will swallow all the traditional deference shown to state economic and social regulation. The modest scheme at issue here does not penalize in a constitutional sense veterans who joined the Armed Forces in other States for choosing to eventually settle in New York, and does not deny them equal protection. I would reverse the judgment of the Court of Appeals for the Second Circuit.