Orville C. **KARAN**

v.

Frederick G. **ADAMS, Commissioner, Connecticut Department of Health Services, Board of Examiners, Dr. George Higgins, Dr. Rhoda K. Burnham, Paul A. Hudon, Ruth Kronick, and Alexander Tolor.**

Civ. No. H–90–135 (JAC).

United States District Court, D. Connecticut.

Sept. 29, 1992.

David C. Shaw, Trowbridge, Ide, Courtney & Mansfield, Hartford, Conn., for plaintiff.

Susan Brooks Flanders, Office of the Atty. Gen., Hartford, Conn., for defendants.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, Chief Judge:

The plaintiff, Dr. Orville C. Karan ("Dr. Karan"), has been denied a license to practice psychology in Connecticut on the ground that his educational credentials fail to satisfy Connecticut's licensure standards. Dr. Karan brings this action against Frederick G. Adams, Commissioner of the Connecticut Department of Health Services ("Department"); against the Connecticut Board of Examiners of Psychologists ("Board"); and against the five individual members of the Board,[1] alleging that Connecticut's standards and procedures for granting licenses to practice psychology in the state violate both the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Pending before the court are the parties' cross-motions for summary judgment.

## BACKGROUND

The relevant facts in this case are not in dispute. Dr. Karan received his doctoral degree in 1974 at the University of Wisconsin in the Department of Behavioral Studies.[2] The department prepared graduate students for the practice of rehabilitation psychology but was not accredited by the American Psychological Association ("APA"), which did not then and does not now accredit doctoral programs in rehabilitation psychology. While enrolled at the University of Wisconsin, Dr. Karan completed five "core" courses required of all doctoral candidates, seven credit hours in independent reading, twelve credit hours in a workshop on education of handicapped children, and a variety of other courses. This program of study satisfied the Wisconsin requirements for psychology licensure at the time Dr. Karan received his doctoral degree.

After receiving his doctoral degree, Dr. Karan completed a one-year period of post-doctoral study under the supervision of a licensed psychologist. He passed the national examination known as the Examination of the Professional Practice of Psychology ("EPPP") in 1975, passed the Wisconsin licensing examination in 1976, and received his license to practice psychology in Wisconsin in the same year. Since then, Dr. Karan has compiled a lengthy *curriculum vitae*. He has served in several teaching and administrative positions within the field of psychology, published numerous articles in psychology journals, and testified before Congress on behalf of the APA. Dr. Karan was appointed an associate professor of psychology at the University of Connecticut in 1988, and was recently promoted to a full professorship.

In May 1989, Dr. Karan applied to the Connecticut Department of Health Services for a license to practice psychology. As a general rule, Connecticut law requires an applicant for psychology licensure to meet three requirements: an applicant must (1) pass a psychology examination given by the Department; (2) satisfy the Department that he has received a doctoral degree based on a program of studies that was "primarily psychological" in content; and (3) satisfy the Department that he has had at least one year of post-doctoral experience of a type satisfactory to the Board. *See* Conn.Gen.Stat. § 20–188 (1989).[3] An

---

1. The defendant members of the Board are: George C. Higgins, Chairman, Rhoda K. Burnham, Paul A. Hudon, Ruth Kronick, and Alexander Tolor.

2. The department from which Dr. Karan received his doctoral degree is now known as the Department of Special Education and Rehabilitation Psychology. *See* Plaintiff's Statement of Undisputed Facts (filed October 29, 1990) at 1.

3. Conn.Gen.Stat. § 20–188 provides in pertinent part that

 [b]efore granting a license to a psychologist, the department shall, except as provided in section 20–190, require any applicant therefor to pass an examination in psychology to be given at such time and place as the department prescribes. Examinations shall be prescribed by the department, with the advice and consent of the board, and shall be administered to applicants by the department of health services under the supervision of the board. Each applicant ... shall satisfy the department that he (1) has received the doctoral degree based on a program of studies whose content was primarily psychological from an educational institution registered as provided in section 20–189; and (2) has had at least one year's postdoctoral experience of a type satisfactory to the board.

 Conn.Gen.Stat. § 20–189, to which the above provisions refer, does not actually provide for

applicant can obtain a waiver of the examination requirement by "endorsement" if he is a currently practicing psychologist and is licensed in a state that applies licensure standards "substantially similar to, or higher than" those of Connecticut. *See* Conn. Gen.Stat. § 20–190 (1989).[4] Under no circumstances, however, can an applicant obtain a waiver of the other two requirements established by § 20–188. For that reason, an applicant cannot be licensed—regardless of the extent of his later professional accomplishments—if he cannot show that his program of doctoral study was "primarily psychological" in content.

A program of doctoral study is considered to be "primarily psychological" if it is accredited by the APA. *See* Conn.Regs. § 20–188–2(a).[5] If a program of study is not APA-accredited, it will be considered "primarily psychological" only if it meets the standards established by Connecticut

regulations. *See* Conn.Regs. § 20–188–2(b) and (c).[6] For purposes of these regulations, which took effect on March 23, 1988, unaccredited programs are divided into two groups. A program completed before 1980 is deemed "primarily psychological" if the Department determines, in consultation with the Board, that the program complied with "the recognized written national standards for the preparation of psychologists at the time of the applicant's graduation." *See* Conn.Regs. § 20–188–2(b).[7] A program completed after January 1, 1980, is deemed "primarily psychological" if it conforms to a detailed set of standards laid out by Connecticut regulations. *See* Conn. Regs. § 20–188–2(c). An unaccredited program that fails to meet the applicable standards under these regulations leads automatically to rejection of a candidate's application for licensure. In no circumstance may a candidate compensate for inade-

---

"registering" educational institutions. Rather, the section provides simply that "[a]pplicants shall graduate from an education program approved by the board with the consent of the commissioner of health services."

4. Conn.Gen.Stat. § 20–190 provides in pertinent part that

[t]he department of health services may grant a license without examination to any applicant who is a currently practicing, competent practitioner and who at the time of application is licensed or certified by a similar board of another state whose standards, in the opinion of the department, are substantially similar to, or higher than, those of this state, provided the department is satisfied that the applicant understands Connecticut laws and regulations relating to the practice of psychology.

5. Conn.Regs. § 20–188–2(a) provides that

[a] program holding accreditation by the American Psychological Association shall constitute an approved doctoral educational program in psychology for Connecticut psychology licensure, pursuant to Connecticut General Statutes, Sections 20–188 and 20–189.

6. Conn.Regs. § 20–188–2(b) provides that

[a] program, in which the applicant completed the doctoral degree prior to January 1, 1980, and which does not hold accreditation by the American Psychological Association shall be an approved doctoral educational program in psychology for Connecticut psychology licensure, pursuant to Connecticut General Statutes, Section 20–188 and 20–189, when the Department has determined, with

the advise [sic] and assistance of the Board, that the program was in compliance with recognized written national standards for the preparation of psychologists at the time of the applicant's graduation.

Conn.Regs. § 20–188–2(c) provides that an unaccredited doctoral program completed on or after January 1, 1980, shall be an approved doctoral program in psychology for Connecticut psychology licensure if that program satisfies each of eleven criteria listed by the regulation. The tenth of these criteria was apparently used by the defendants in this case in evaluating the plaintiff's application. This criterion provides that:

(10) The applicant shall demonstrate that the content of his doctoral program was primarily psychological by completion of classroom instruction in at least three of the following four substantive basic science areas:

(A) BIOLOGICAL BASES OF BEHAVIOR, for example, physiological psychology, comparative psychology, neuropsychology, sensation and perception, psychopharmacology.

(B) COGNITIVE–AFFECTIVE BASES OF BEHAVIOR, for example, learning, thinking, motivation, emotion.

(C) SOCIAL BASES OF BEHAVIOR, for example, social psychology, group processes, organizational and systems theory.

(D) INDIVIDUAL DIFFERENCES, for example, personality theory, human development, abnormal psychology.

7. The regulations do not state how the Department or the Board are to ascertain the "written national standards" to be applied in evaluating pre–1980 educational programs.

quate educational credentials by completing additional courses in fields where his original program fell short. In no circumstance may a candidate's educational deficiencies be outweighed by his professional accomplishments. The only permissible method of overcoming inadequate educational credentials is to complete an entirely new doctoral program in psychology. *See* Plaintiff's Statement of Undisputed Facts (filed Oct. 29, 1990) ("Plaintiff's Facts"), Attachment C (deposition of Joseph Gillen) ("Gillen Deposition") at 24.

Upon receiving Dr. Karan's application in May 1989, the Department initially evaluated his educational program according to the standards applicable to degrees received *after* 1980. After completing this review, the Department informed Dr. Karan that his educational credentials revealed "apparent deficiencies in core content areas of psychology, including: Biological Bases of Behavior, [and] Social Bases of Behavior." Letter from Joseph J. Gillen to Plaintiff (June 2, 1989), Complaint, Exhibit B ("Letter of June 2"). In the same letter, the Department invited Dr. Karan to

> arrange for the appropriate faculty member or Department Administrator to submit official documentation directly to this office. Appropriate documentation includes information from course catalogs, official course descriptions, or course syllabi which are on file with the academic institution where you completed your studies.

*Id.*

In response to this letter, Dr. Karan informed the Department that he was having "considerable difficulty" in obtaining the requested documentation and stated that he believed his courses had covered the core content areas required by Connecticut standards. Letter from Plaintiff to Joseph J. Gillen (July 6, 1989), Complaint, Exhibit C ("Letter of July 6"). A few weeks later, Dr. Karan submitted the documents that he had been able to obtain and informed the Department that official documentation of some of his courses was simply unavailable. Letter from Plaintiff to Joseph J. Gillen (July 20, 1989), Complaint, Exhibit D. After reviewing the additional materials submitted by Dr. Karan, the Department

informed him that it had confirmed its initial conclusion that his program of study "does not meet the statutory requirement of being primarily psychological in content." Letter from Joseph J. Gillen to Plaintiff (July 24, 1989), Complaint, Exhibit E ("Letter of July 24").

In the same letter, the Department informed Dr. Karan that "[n]ewly promulgated regulations"—which had, in fact, taken effect on March 23, 1988—afforded him the opportunity to have his educational credentials reviewed according to written national standards in effect at the time he received his degree. *Id.* The letter also stated that this review would be conducted initially by the Board, which would then advise the Department of its recommendations regarding Dr. Karan's credentials. The letter indicated the time of the next scheduled meeting of the Board, but did not state whether the meeting would be open to the public or whether applicants would be allowed to present testimony at the meeting. *Id.*

Dr. Karan promptly asked the Department to have the Board evaluate his educational record according to the standards in effect at the time he received his degree. Letter from Plaintiff to Joseph J. Gillen (July 28, 1989), Complaint, Exhibit G. The Board members conducted their review of Dr. Karan's educational record in private, *prior* to the meeting at which the Board formally voted on whether Dr. Karan's program of study was adequate for licensure. *See* Gillen Deposition at 19. The Board then voted 3–0 at a meeting on November 2, 1992, to recommend that the Department deny Dr. Karan's application on the ground that his program of studies did not meet the written national standards in effect in 1974. *See* Defendants' Statement of Material Facts as to Which There is No Genuine Issue to Be Tried (filed Oct. 29, 1990) ("Defendants' Facts") at ¶ 18. The meeting at which the Board voted on Dr. Karan's application was a public meeting, which Dr. Karan was free to attend, but he was not notified that his application would be considered on that date nor was he personally invited to attend. *See* Plaintiff's Facts, Attachment B (deposition of George C. Hig-

gins) ("Higgins Deposition") at 18. Moreover, Dr. Karan would not have had the right to address the Board even if he had attended the meeting. *See* Gillen Deposition at 22. Based on the recommendation of the Board, the Department informed Dr. Karan that he was "not eligible for Connecticut psychologist licensure." Letter from Joseph J. Gillen to Plaintiff (November 3, 1989), Complaint, Exhibit H. The letter did not inform Dr. Karan of the source of the national standards that had been applied, nor did it inform him of the areas in which his educational program was deficient.

Following this decision, Dr. Karan requested an "appeal" of the Department's decision and urged the Department not to reject his application solely on the basis of any deficiencies in his educational record. Letter from Plaintiff to Joseph J. Gillen (November 17, 1989), Complaint, Exhibit I. The Department responded: "Because the eligibility issue centered on educational credentials, no other criterion was, or could be, considered. Thus, it is the Department's final determination that you are ineligible for Connecticut psychology licensure." Letter from Joseph J. Gillen to Plaintiff (Nov. 29, 1989), Complaint, Exhibit J ("Letter of November 29"). Dr. Karan then inquired about a "formal appeal process." Letter from Plaintiff to Joseph J. Gillen (December 28, 1989), Complaint, Exhibit K. In response, the Department informed him that "there is no appeal process beyond full-Board review. However, you do have the right to seek the advice of an attorney." Letter from Joseph J. Gillen to Plaintiff (January 2, 1990). Finally, Dr. Karan asked the Board to be "advised of [his] appeal rights." Letter from Plaintiff to George C. Higgins (January 11, 1990), Complaint, Exhibit M. The chairman of the Board informed him that the Board, like the Department, had "exercised all the authority it has in this matter, and it has no further appelate [sic] procedures. All I can suggest is that if you believe you have been wrongfully denied an opportunity to be licensed in Connecticut you seek independent legal counsel." Letter from George C. Higgins to Plaintiff (January 22, 1990), Complaint, Exhibit N.

After being rejected for licensure on the basis of insufficient educational credentials, Dr. Karan was permitted neither to appeal the decision of the Department nor to "remediate" the alleged deficiencies by taking courses in areas where his program had been found inadequate. *See* Gillen Deposition at 23. Instead, Dr. Karan was faced with two options. First, he could reapply for licensure if and when he was able to obtain further official documentation of the content of his educational program. Defendants' Statement of Material Facts as to Which There is No Genuine Issue to Be Tried (filed Oct. 29, 1990) ¶ 22. Failing that, he could "go back and initiate a new program that would be acceptable and that would meet the educational requirements." *See* Gillen Deposition at 24. Faced with these choices, Dr. Karan brought this lawsuit.

## DISCUSSION

■■■ Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The non-moving party may defeat the summary judgment motion by produc-

ing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Finally, " 'mere conclusory allegations or denials' " in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)).

The parties have both filed motions for summary judgment. Although there are certain differences in the two versions of the facts of this case, neither side contends that there exist material issues of fact necessitating a trial. Because both motions raise the identical legal issues, I will treat them together.

Dr. Karan argues that the only issues in this case are (1) whether the defendants violated the Equal Protection Clause by burdening his right to travel through the imposition of certain unreasonable barriers to the practice of psychology in Connecticut and (2) whether the defendants violated both substantive and procedural due process in denying him a license to practice psychology. *See* Memorandum in Support of Plaintiff's Motion for Summary Judgment (filed Oct. 29, 1990) ("Plaintiff's Memorandum") at 15. The defendants assert that the facts alleged by Dr. Karan fail to demonstrate violations of either the Equal Protection Clause or the Due Process Clause. *See* Defendants' Memorandum in Support of Summary Judgment (filed October 29, 1990) ("Defendants' Memorandum") at 37. I will address the equal protection and due process issues in turn.

## I.

■ Dr. Karan claims that the defendants' decision prohibiting him from practicing psychology in Connecticut has placed an impermissible burden on his constitutional right to travel interstate. The freedom to travel throughout the United States guarantees that citizens are "free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regu-

lations which unreasonably burden or restrict this movement." *Shapiro v. Thompson,* 394 U.S. 618, 629, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969). The Court declined in *Shapiro* to ascribe the right to travel to a particular constitutional provision, *id.* at 630, 89 S.Ct. at 1329, but held that state laws classifying residents based on their exercise of the "fundamental right of interstate movement" may violate the Equal Protection Clause. *Id.* at 633, 638, 89 S.Ct. at 1330, 1333. To withstand review, any classification that serves to "penalize" the exercise of the right of interstate movement must therefore be shown to be necessary to promote a compelling governmental interest. *Id.* at 638, 89 S.Ct. at 1333. This standard of review has been applied consistently in subsequent cases. *See, e.g., Attorney General of New York v. Soto-Lopez,* 476 U.S. 898, 901, 106 S.Ct. 2317, 2319, 90 L.Ed.2d 899 (1986); *Dunn v. Blumstein,* 405 U.S. 330, 338, 92 S.Ct. 995, 1001, 31 L.Ed.2d 274 (1972) (collecting cases).

■ A state action implicates the right to travel only if it "penalize[s]" those residents who have recently entered the state. *See Dunn,* 405 U.S. at 338, 92 S.Ct. at 1001. In other words, a state acquires the burden of meeting the compelling-interest standard only when it singles out recent migrants by imposing a requirement that "operates to penalize those persons, *and only those persons,* who have exercised their constitutional right of interstate migration...." *Id.* at 340, 92 S.Ct. at 1002 (emphasis supplied). Absent a showing that deterrence of interstate travel was a primary objective of the state's action, the right to travel is not implicated merely because the burden of a state policy falls disproportionately on recent migrants.

■ The Connecticut statute at issue in this case does not impermissibly interfere with Dr. Karan's right to travel because it does not penalize recent migrants as a class. *Every* applicant, not just those who have recently arrived from out of state, must satisfy the licensing requirements that happen to stand as an obstacle to Dr. Karan. *Every* applicant must "graduate from an education program approved by

the board with the consent of the commissioner of health services." Conn.Gen.Stat. Ann. § 20–189 (1989). *Every* applicant must "satisfy the department that he ... has received the doctoral degree based on a program of studies whose content was primarily psychological from an educational institution registered as provided in section 20–189." Conn.Gen.Stat.Ann. § 20–188 (1989). In practice, these requirements may cause the denial of licensure to recent migrants more frequently than to long-time residents. But presumably there are many recent migrants who satisfy both of these requirements, as well as some longtime residents who do not.

Connecticut, like other states, has taken steps to soften the impact of its licensing requirements on out-of-state psychologists who move to Connecticut. First, Connecticut provides that the examination requirement can be waived for "currently practicing, competent practitioners" who are licensed by other states which have standards "substantially similar to, or higher than" those of Connecticut. Conn.Gen. Stat. § 20–190.[8] Second, Connecticut recently adopted regulations which allow certain non-accredited doctoral programs to satisfy Connecticut's licensing requirements. Conn.Regs. § 20–188–2(b).[9] In taking these steps, Connecticut implicitly acknowledges that its licensing requirements may pose a practical barrier to some out-of-state psychologists who wish to move to Connecticut. But Connecticut is not obligated to take these steps, nor is it required to take the much more extreme step of allowing any psychologist licensed by another state to practice in Connecticut.

It is undisputed that Dr. Karan's ability to practice psychology has been burdened by the application of Connecticut's licensing statutes. It is also undisputed that he only had to bear this burden because he wished to move to Connecticut. But these facts alone do not support Dr. Karan's claim that Connecticut's statutes place a burden on out-of-state licensees that is not also placed on in-state applicants. The essence of any claim under the Equal Protection Clause is that the legislature has made

an impermissible classification. This is simply not the case here, so summary judgment with respect to the Equal Protection Claim must be granted for the defendants.

## II.

Dr. Karan also claims that in denying him a license to practice psychology the defendants violated the substantive and procedural "components" of the Due Process Clause of the Fourteenth Amendment. I address the substantive and procedural due process arguments in turn.

## A.

 A state deprives a candidate for licensure of substantive due process if the state imposes licensure requirements that have no rational connection with the candidate's fitness or capacity to practice in the profession. *Schware v. Board of Bar Examiners*, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957). The rational-relationship test mandated by *Schware* gives states broad discretion to regulate professional licensure. Under this test, states are free to impose licensure requirements that are reasonably calculated to protect the public health, safety, and welfare; they are under no constitutional duty to choose the best possible means of furthering those goals. *See Chalfy v. Turoff*, 804 F.2d 20, 23 (2d Cir.1986); *Conrad v. County of Onondaga Examining Board for Plumbers*, 758 F.Supp. 824, 828 (N.D.N.Y.1991); *Solomon v. Emanuelson*, 586 F.Supp. 280, 284 (D.Conn.1984).

 Dr. Karan asserts that Connecticut's licensing standards for out-of-state psychologists fail the rational-relationship test in two respects. First, he claims that it is irrational for Connecticut to require psychologists licensed in other states to meet specific educational criteria. Complaint ¶ 35. He argues that this standard excludes from licensure many competent practicing psychologists who might be able to prove their competence through the quality of their post-doctoral training, their publications, their teaching experience, and

---

8. *See* note 4 *supra.*

9. *See* note 6 *supra.*

their practice. Plaintiff's Memorandum at 12. Second, Dr. Karan claims that it is irrational for Connecticut to provide no opportunity for candidates to "remediate" the deficiencies in their educational program by taking courses that make up the difference between their curriculum and the curriculum required by Connecticut. Complaint ¶ 36. He argues that requiring candidates whose transcripts lack a number of assertedly essential courses to undertake an entirely new doctoral program does nothing to ensure the competence of psychologists practicing in Connecticut.

The defendants respond to these arguments in several ways. First, the defendants argue that the challenged requirements serve the state's policy of ensuring that all licensed psychologists possess general training and competence across the field of psychology. Defendants' Memorandum at 32. They acknowledge that Dr. Karan may have expertise in one "specialty" of psychology, but maintain that such expertise is not sufficient for general psychology licensure. *Id.* Second, the defendants point out the potential difficulties in allowing candidates to compensate for inadequate educational programs by proffering evidence of their experience or by taking a few additional courses. They argue that either approach would introduce subjective elements into the licensing process, thus undermining the fairness of the process and creating new bases for constitutional attacks. Defendants' Memorandum at 32.

The educational requirements imposed by Connecticut are clearly quite rigid, and the application of these requirements probably results in the exclusion of some competent psychologists from practice in Connecticut. Moreover, it is true that more flexible educational requirements would enable Connecticut to identify competent psychologists more accurately with little additional administrative burden. But these facts—and they are indeed facts—are not sufficient to support a finding that Connecticut's existing standards fail the rational-relationship test. Connecticut has attempted to balance, as all states must, the value of more accurate decisionmaking against the cost of greater administrative complexity. Because they have done so in

a reasonable manner, summary judgment with respect to Dr. Karan's substantive due process claim must be granted for the defendants.

### B.

Dr. Karan's procedural due process claim raises two distinct issues. At the threshold, the claim raises the issue of whether Dr. Karan has a property interest that can be taken away only through procedures that satisfy the constitutional requirements of "due process." The second issue, which arises only if the threshold question is resolved in Dr. Karan's favor, is whether the procedures used by the state actually provided Dr. Karan with the process due.

### (1)

■ The requirements of procedural due process are applicable only where a state deprives a person of a constitutionally protected property or liberty interest. *Board of Regents v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972). To possess a protectible interest in a benefit, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. at 2709. This rule applies even where the loss suffered is great. "[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the *nature* of the interest at stake." *Id.* at 571, 92 S.Ct. at 2706 (emphasis in original); *see also Meachum v. Fano,* 427 U.S. 215, 225–29, 96 S.Ct. 2532, 2538–41, 49 L.Ed.2d 451 (1976).

■ A person possesses a property interest when there are "such rules or mutually explicit understandings that support his claim to entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). The understandings that give rise to a property interest are generally grounded outside the Constitution, most often in state law. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Nevertheless, it is federal constitutional law that determines whether a particular

property interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause. *Id.; see also Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978).

■ The property interest claimed by Dr. Karan is his "legitimate expectation that he would be allowed to continue his practice in Connecticut, or, at least, that he might be allowed to sit for the Connecticut licensure examination." Plaintiff's Memorandum at 21. While it is clear that becoming licensed in Connecticut matters deeply to Dr. Karan, he does not yet have a constitutionally protectible "property interest" in Connecticut licensure. Dr. Karan lacks a property interest in licensure because he has not yet satisfied one of the statutory prerequisites for obtaining a license— namely, passing the psychology licensure examination. At this stage, then, Dr. Karan's interest can best be described as an interest in being permitted to take the Connecticut licensure examination (or to satisfy the examination requirement through "endorsement").[10] In essence, Dr. Karan's due process claim is that the procedures used in evaluating his educational credentials deprived him of the opportunity to demonstrate his expertise on the licensure examination.

Our Court of Appeals considered a similar claim to procedural due process protection in *Charry v. Hall,* 709 F.2d 139, 144 (2d Cir.1983). In that case, the state of New York had refused to allow the plaintiff, Dr. Charry, to take the psychology licensure examination on the ground that his doctoral degree in "Human Relations and Social Policy" did not meet the state's minimum licensure requirements. *Id.* at 142. Dr. Charry then challenged the procedures used by the state in evaluating his educational program, claiming that his interest in taking the examination was a property interest protected by procedural due process. In deciding whether Dr.

Charry had such a property interest, the Court recognized that "[t]he right to take an examination is hardly the equivalent of the grant of the license for which it is taken...." *Id.* at 144. The Court also recognized that "'revocation of a license is far more serious than denial of an application for one.'" *Id.* (citing Henry J. Friendly, "Some Kind of Hearing," 123 U.Penn.L.Rev. 1267, 1296 (1975)). But the Court nevertheless saw an injustice in the "arbitrary rejection of a fully qualified candidate," and therefore held that "an applicant satisfying statutory prerequisites has a 'legitimate claim of entitlement' to take the examination for the professional status of psychologist." *Id.*

The similarity between *Charry* and this case strongly suggests that Dr. Karan has a property interest under the law of this Circuit in sitting for the Connecticut licensure examination. Even so, the defendants insist that Dr. Karan lacks such an interest. The defendants make two principal arguments. First, they attempt to distinguish *Charry* on its facts, arguing that Dr. Karan fails the *Charry* test because he does not satisfy all of the "statutory prerequisites" for licensure. Defendants' Memorandum at 16–17. That is true, in the literal sense that Dr. Karan has not convinced Connecticut licensing officials of the adequacy of his educational credentials. But the same was also true of Dr. Charry, who was found to have a protectible interest in sitting for the examination despite the fact that state officials had found his educational program inadequate. *See Charry,* 709 F.2d at 144–46. The fact that Dr. Charry was nevertheless found to have a property interest in sitting for the examination rebuts the defendants' first argument against the application of *Charry* here.

The defendants' second argument is that *Charry* must be read in light of the subsequent line of cases that began with our

---

**10.** Endorsement—in effect, a waiver of the examination requirement—is available to "currently practicing, competent psychologists" who are licensed in other states whose current licensing standards are found to be at least equal to those of Connecticut. *See* Conn.Gen.Stat. § 20–190, *supra* note 4. The endorsement option may be of little practical significance to Dr. Karan, since available evidence indicates that he may not meet the requirements for endorsement. *See* Defendants' Facts at 4–5.

Court of Appeals' decision in *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54 (2d Cir.1985). Defendants' Memorandum at 15. This argument is more compelling, and deserves careful consideration. In *Yale Auto Parts,* the Court devised a test that it has used repeatedly in determining whether a claimant possesses a property interest protected by the Due Process Clause. *See e.g., RRI Realty Corp. v. Southampton,* 870 F.2d 911, 917 (2d Cir.), *cert. denied,* 493 U.S. 893, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989) (discussing cases). In considering a challenge to the denial of a certificate that was needed to operate a junkyard, the Court held that "the question of whether an applicant has a legitimate claim of entitlement to the issuance of a license or certificate should depend on whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted." *Yale Auto Parts,* 758 F.2d at 59. Applying the *Yale Auto Parts* test to this case, the defendants assert that Dr. Karan can assert no due process challenge to the state's evaluation procedures because he clearly lacks the requisite educational credentials:

> [E]ven absent the claimed procedural due process violation, i.e., had there been a hearing on plaintiff's educational qualifications, the undisputed content of plaintiff's doctoral program would necessitate a denial of the application under the established standards employed by the defendants. Plaintiff's record simply does not reveal essential core psychology content areas of study, as required by relevant APA standards.

Defendants' Memorandum at 15–16.

The defendants' *Yale Auto Parts* argument is unpersuasive for three reasons. First, it is not at all clear on the present record that Dr. Karan's course of doctoral study fell short of the national standards in effect when he received his degree. The fact that Dr. Karan has so far been unable to demonstrate the adequacy of his program reflects in part the limitations of the archival records at the University of Wisconsin. *See* discussion *supra* at 904. It remains possible that a more wide-ranging investigation into Dr. Karan's course of study would reveal that it did cover the required subjects.

Second, the defendants' analysis is unpersuasive because it misapplies the *Yale Auto Parts* test. The core of that test is the determination of whether in the absence of the alleged due process violation there would be a "certainty or a very strong likelihood" of the claimant's success. *See Yale Auto Parts,* 758 F.2d at 59. This language appears to invite a factual inquiry into each plaintiff's prospects for success absent the alleged due process violation. Our Court of Appeals, however, has unequivocally disavowed that interpretation of the *Yale Auto Parts* test:

> Application of the test must focus primarily on the degree of discretion enjoyed by the issuing authority, not the estimated probability that the authority will act favorably in a particular case.... Even if in a particular case, objective observers would estimate that the probability of issuance was extremely high, the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest.... Since the entitlement analysis focuses on the degree of official *discretion and not on the probability of its favorable exercise,* the question of whether an applicant has a property interest will normally be a matter for the courts.

*RRI Realty,* 870 F.2d at 918. This interpretation of the *Yale Auto Parts* test shifts the focus of our inquiry away from the question of whether Dr. Karan would have been able to demonstrate the sufficiency of his educational qualifications. The decision in *RRI Realty* requires instead that we evaluate the degree of discretion that the Department has in making licensure decisions. This very issue was directly addressed in *Charry.* Referring to cases in which an interest in licensure had been found not to be a protected property interest, the Court stated that "such cases are distinguishable on the ground that, unlike the present case, they involved statutes granting broad and almost unlimited discretion to the licensing authority." *Charry,* 709 F.2d at 144. This case, of

course, involves a licensing agency operating under the laws of Connecticut rather than New York. But the defendants have not attempted to show, and I do not find, any substantial difference between the discretion of the licensing agency in *Charry* and the discretion of the licensing agency in this case. In both cases the discretion of the licensing agency is minimal, particularly in comparison with the broad discretion exercised by local boards charged with regulating land use. For that reason, the *Yale Auto Parts* test supports the conclusion that Dr. Karan has a property interest in sitting for the licensure examination.

Finally, the defendants' *Yale Auto Parts* argument is unpersuasive because it ignores the possibility that the test might not even apply to the type of due process claim raised here—namely, one that implicates an individual's interest in a "status." Our Court of Appeals has observed that the expansion of procedural due process has generally occurred where "procedural protection is sought in connection with the state's revocation of a *status,* an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits." *S & D Maintenance Co. v. Goldin,* 844 F.2d 962, 966 (2d Cir.1988) (emphasis in original). Although in *S & D* the Court was attempting to explain why procedural due process does not protect an "ordinary contractual right," its reasoning also helps to explain why procedural due process protection does protect certain other rights. In *Charry,* for example, a property interest was found where a claimant asserted an interest in becoming a psychologist—an interest, in other words, in obtaining permanent membership in a profession. *Charry,* 709 F.2d at 144. More recently, a property interest was found even where a claimant's membership in a profession was not at stake. *Ezekwo v. New York City Health & Hospitals Corp.,* 940 F.2d 775, 783 (2d Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). In holding that a physician had a property interest in a temporary position as Chief Resident in a hospital, the Court found it sufficient that serving as Chief Resident would be of "very significant professional value" to the physician. *Id.* at 783.

Significantly, our Court of Appeals did not even discuss *Yale Auto Parts* in determining whether the claimant in *Ezekwo* had asserted a property interest protected by procedural due process. *See Ezekwo,* 940 F.2d at 782–83. This omission raises at least the possibility that the *Yale Auto Parts* test is applicable only within the confines of cases involving land-use licenses and other matters that do not affect a claimant's status. Even if this is not so, it is nonetheless clear for the reasons stated above that *Yale Auto Parts* stands as no obstacle to the conclusion that Dr. Karan holds a constitutionally protectible property interest in the opportunity to sit for the Connecticut licensure examination.

(2)

■ Dr. Karan's property interest in sitting for the licensure examination, we have concluded, entitles him to procedural due process. The question that remains is whether the process actually provided by the defendants in this case was constitutionally sufficient. The test for determining what process is due in a particular case requires consideration of three factors: (1) the nature of the private interest sought to be protected; (2) the risk of erroneous deprivation of that interest through the procedure used and the probable value of additional safeguards; and (3) the government's interest, including the fiscal and administrative burdens that would be placed on it by additional procedures. *Charry,* 709 F.2d at 145, citing *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

*a. private interest at stake*

■ For purposes of procedural due process, the private interest sought to be protected here is as an interest in the opportunity to sit for the Connecticut licensure examination. *See* discussion *supra* at 908–09. Described in this way, Dr. Karan's interest is the equivalent of the interest of Dr. Charry. *See Charry,* 709 F.2d at

144. In fact, however, the opportunity to sit for the examination—and, by extension, the opportunity to become licensed—means a great deal more to Dr. Karan than it could have meant to Dr. Charry. This case involves a candidate who has moved to the state of Connecticut after practicing for many years, with a license, in another state. It is true that Dr. Karan has no vested property right in a Connecticut psychologist's license, since there is no legal or constitutional obligation on Connecticut to grant licensure to all persons licensed by other states. But it is also true that this candidate's interest far exceeds that of a candidate who, like Dr. Charry, has never been licensed and has never practiced. Dr. Karan has already invested much of his life in establishing a career as a psychologist, going far beyond the acquisition of a doctoral degree and the completion of postdoctoral training. He has spent years as a practitioner and administrator; he has spent years publishing scholarly articles and teaching students; and he has spent years developing a professional reputation and a network of professional relationships in his chosen field. These are the fruits of nearly two decades' work, and they underscore the magnitude of the personal interest at stake in this case.

For a candidate in this position, denial of licensure is much closer in its practical effect to revocation of a license than it is to denial of a license to someone who has never practiced. As a result, the facts presented here can be sharply distinguished from the facts presented in *Charry*. In that case, the Court concluded that procedural due process did not entitle Dr. Charry to any procedures beyond those that the state had employed. *See Charry*, 709 F.2d at 145-46. The Court based this conclusion on its finding that the interest of a recent psychology degree recipient in taking a licensure examination "hardly approximates the importance of a vested property right such as a license itself." *Charry*, 709 F.2d at 145. In the present case, in contrast, the interest of Dr. Karan does "approximate" the interest of a license holder for the reasons stated above. Consequently, the fact that an evidentiary hearing was denied in *Charry* does not mean that it must be denied here. On the contrary, the substantially greater private interest at stake in this case weighs heavily in favor of requiring greater procedural protection here than was found necessary in *Charry*.

### b. risk of erroneous deprivation

▋ Due process does not require that decisionmaking procedures be error-free, but it does require that the procedures be "reasonably calculated" to achieve the state's chosen objectives. *See Charry*, 709 F.2d at 146. The determination of whether Connecticut's licensure procedures are reasonably calculated to achieve the goal of screening out unqualified psychologists requires a careful examination of the procedures themselves and the circumstances in which they were applied. Upon examination, it appears that these procedures are strikingly prone to error because they fail to account for the difficulties that candidates may have in documenting the content of educational programs completed many years ago.

First, the procedures require candidates to submit documentation that apparently was unavailable in this case, and presumably is unavailable in the case of many other candidates who seek licensure in Connecticut after practicing elsewhere. In this case, the Department initially requested that Dr. Karan "arrange for the appropriate faculty member or Department Administrator to submit official documentation directly to this office." Letter of June 2. Dr. Karan was told that "[a]cceptable documentation includes information from course catalogs, official course descriptions or course syllabi" on file with the institution where the candidate completed his studies. *Id.* As might be expected from a candidate who completed the relevant courses more than fifteen years earlier, "[o]fficial course descriptions and/or syllabi [were] simply not available." Letter of July 6. Despite this understandable obstacle to production of the requested documents, the defendants did not offer Dr. Karan an alternative method for demonstrating the sufficiency of his educational program. Instead, the defendants simply

based their subsequent review of Dr. Karan's credentials on the incomplete set of archival records that he was able to compile. *See* discussion *supra* at 904.

Second, the procedures provided no significant opportunity for the candidate to supplement the written record with oral testimony regarding the content of his educational program. Although the Department informed Dr. Karan of the date and time of the meeting at which the Board would review his educational credentials, the Department did not inform him that he would be permitted to attend the Board's meeting. Letter of July 24. Indeed, Dr. Karan would not have been permitted to present any evidence or testimony at the meeting even if he had attended; he would have been permitted only to observe the decision, not to influence it. *See* Gillen Deposition at 21–23. The fact that a candidate may be permitted to meet individually with members of the Department hardly constitutes a meaningful opportunity to be heard, particularly when no effort is made to inform the candidate of this opportunity.

Third, the procedures provided no forum for meaningful review of the initial evaluation of the candidate's educational credentials. Dr. Karan's educational credentials were evaluated according to the standards applicable to pre–1980 degree candidates on one and only one occasion: the November 2, 1990 meeting of the Board.[11] On the day after the Board's decision, the Department accepted the Board's judgment and informed Dr. Karan that his licensure application was denied. Letter of Nov. 3. Dr. Karan then inquired repeatedly about the existence of an appeal process, but he was told that the Department had made its "final determination," Letter of November 29, and that "[t]here is no appeal process beyond the full-Board review. However, you do have the right to seek the advice of an attorney." Letter of Jan. 2.

In sum, the procedures used in this case created a substantial risk of error because they were based on the implicit assumption that the evaluation of older educational programs requires no greater care than the evaluation of more recent programs. This assumption is simply untenable in light of the evidence that the passage of time is often accompanied by the substantial deterioration of both written records and human memories. For that reason, procedures that might be adequate in other contexts are not necessarily sufficient here. Procedures that produce reasonably accurate evaluations of the educational credentials of a recent degree recipient can be highly unreliable in reviewing the educational credentials of candidates who graduated many years ago.

In light of the obstacles faced by candidates like Dr. Karan in documenting his educational program, it is reasonable to require the use of greater procedural safeguards in this case than in cases involving recent degree recipients like Dr. Charry. But in fact the procedures employed by Connecticut do not even equal, let alone exceed, the procedures used by New York to review Dr. Charry's credentials. When Dr. Charry applied to the New York State Education Department ("Education Department") for admission to the psychology licensing examination, the Education Department sent out a specific form to a designated liaison officer at Dr. Charry's university requesting information about his degree and about the nature and extent of his educational preparation. The completed form was then reviewed by the Education Evaluation Committee in Psychology, which made an initial determination of whether he had satisfied the educational

11. It is true that prior to the Board's November 2, 1990, decision the Department had made a preliminary determination of educational inadequacy. That determination, however, was based on the application of regulations that only govern candidates who received degrees after 1980. The fact that these regulations were applied is evident from the first letter that was sent to Dr. Karan. *See* Letter of June 2. That letter informed him that his course of study was inadequate in two areas—biological bases of behavior and social bases of behavior—that are only listed as requirements for post–1980 degree programs. *See* Conn.Regs. § 20–188–2(c). Because the Department's initial judgment was based on inapplicable standards, the Board's November 2, 1990, decision was in effect the first valid assessment of Dr. Karan's educational credentials.

requirements for the license. The Committee determined that his degree was not one in psychology and therefore did not meet the requirements of the state statute and regulations. Dr. Charry sought administrative review of this decision, presenting his application to the New York State Board of Psychologists, which also rejected it. He then appealed to the Committee on Professions, where "[h]e was permitted to introduce by letters and affidavits detailed factual statements on the issue of substantial equivalency and to appear personally." *Charry*, 709 F.2d at 145. After having his application rejected once again, Dr. Charry appealed finally to the Board of Regents which denied his application "because of the inadequacy of his qualifications." *Id.* at 142. While the Court of Appeals did not indicate that the procedures used in *Charry* were the minimum acceptable, the fact that Connecticut failed to provide even this level of procedural protection in a case that required greater procedural protection is a strong basis for concluding that the risk of error in Dr. Karan's case was unacceptably high.

### c. burden of additional requirements

The financial and organizational burden of additional procedural requirements may be significant, but it does not appear to be excessive. The consideration of a broader range of documentary and testimonial evidence, the holding of an evidentiary hearing, and the provision of some form of appeal process would indeed require additional commitments of staff time and financial resources. If the number of applications received from out-of-state licensees is large, Connecticut may find it impossible to rely solely on unpaid volunteers to review candidates' educational credentials. But these changes do not require any radical restructuring of the basic licensing procedures; they can be implemented within the current system at modest expense. Moreover, it is important to bear in mind that additional expense is not in itself a reason to conclude that additional procedures are not constitutionally required. The determining factor is whether the additional cost is justified when considered in context with the other two factors in the *Mathews* test:

namely, the nature of the private interest at stake and the risk of erroneous deprivation of that interest.

### d. conclusion

Due process "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). For this reason, procedures that are constitutionally sufficient in one set of circumstances may be constitutionally insufficient in another. While it is true that the possible occurrence of an error in one or two cases does not necessarily call for additional procedures, *Charry*, 709 F.2d at 146, procedural due process does require that state officials employ a procedure that is "reasonably calculated to protect a person's property right." *Id.* Fundamentally, the state is obligated to provide a person who holds a protected interest "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. at 333, 96 S.Ct. at 902.

In this case, Connecticut has failed to satisfy the procedural due process requirements enunciated in *Mathews*. The private interest at stake here is close to that of a vested property right, since the practical effect of denying licensure to a practicing psychologist who moves to Connecticut approaches that of revoking a psychologist's license. The risk of erroneous deprivation of this private interest is considerable, given the state's failure to adapt its procedures to the special circumstances presented by the inevitable incompleteness of older educational records. Weighed against these concerns, the incremental cost of strengthening existing evaluation procedures is relatively slight. While it is entirely possible that Dr. Karan's educational program fell short of the national standards in effect in 1974, Connecticut's failure to offer him a meaningful opportunity to demonstrate that his courses met those standards is a denial of procedural due process.

The court shall therefore require that Dr. Karan be given another opportunity to

demonstrate that his educational program at the University of Wisconsin satisfied the written national standards in effect at the time he received his doctoral degree. In reconsidering the sufficiency of Dr. Karan's educational program, the defendants shall take reasonable steps to ensure that Dr. Karan is given a meaningful opportunity to demonstrate the content of his educational program. This opportunity shall entail, at a minimum, (1) an opportunity to present all available written records of courses taken by Dr. Karan, including "unofficial" records such as personal papers that Dr. Karan or others may possess; (2) an opportunity for Dr. Karan to submit in writing his own personal recollections and those of others regarding the content of courses that he took and that he believes would satisfy the content requirements; and (3) an opportunity for Dr. Karan to appear personally before the Board to present written evidence and oral testimony. It is not necessary to require the establishment of a formal appeals process, desirable as such a process may be, so long as the initial review procedure conforms to the requirements set out here.

It must be emphasized that the remedy prescribed here is a limited one. First, the hearing conducted by the board can be, but need not be, a formal trial-type hearing with opportunity for cross-examination of witnesses. The hearing procedures prescribed by the Connecticut Administrative Procedure Act ("CAPA") may provide useful guideposts for this proceeding, but they are not adopted by this ruling as requirements. *See* Conn.Gen.Stat.Ann. §§ 4–177 to 178 (1988).

Second, the review to which Dr. Karan is entitled is limited in scope. The sole question to be decided by the Department, with the aid of the Board, is whether Dr. Karan's educational program met the recognized written national standards for psychology licensure that were in effect when he received his doctoral degree. As stated earlier, the state's standards for licensure—and, in particular, the standards applicable to educational credentials—comport with the requirements of the Fourteenth Amendment. The constitutional defect lies in the procedures used for determining whether certain candidates have satisfied those standards. This decision requires only that Connecticut modify its procedures sufficiently to ensure that all applicants for psychology licensure are given a reasonable opportunity to demonstrate that they measure up to the requirements that the state has reasonably seen fit to impose.

Finally, this decision does not require that the procedures found necessary in this case be used in all cases involving the evaluation of candidates' educational credentials. The state's obligation to provide the additional procedures required in the circumstances here presented extends to pre–1980 graduates of unaccredited doctoral programs who, like Dr. Karan, are considered for licensure under the standards set forth in Conn.Regs. 20–188–2(b). Candidates who received degrees from unaccredited institutions during or after 1980—and who must therefore apply for licensure under the standards of Conn.Regs. 20–188–2(c)—would not necessarily be entitled to the same procedural protections that pre–1980 degree recipients deserve. The class of post–1980 degree recipients encompasses many recent degree recipients, who would presumably face relatively few obstacles in demonstrating the content of their educational programs. While some post–1980 degree recipients may be able to present legitimate due process claims, those claims are not before the court today and therefore cannot be decided at this time.

### III.

For the foregoing reasons, the plaintiff's motion for summary judgment is GRANTED and the defendants' motion is DENIED.

It is so ordered.