# IN THE SUPREME COURT OF TEXAS

No. 11-0114

STATE OF TEXAS, PETITIONER,

v.

ANGELIQUE NAYLOR AND SABINA DALY, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

*- consolidated with -*

No. 11-0222

IN RE STATE OF TEXAS, RELATOR

ON PETITION FOR WRIT OF MANDAMUS

JUSTICE WILLETT, joined by JUSTICE GUZMAN and JUSTICE DEVINE, dissenting.

Quite soon—within days—the Supreme Court of the United States will decide a core constitutional controversy: whether the United States Constitution commands a 50-state right to

same-sex marriage.[1] Two years ago in *United States v. Windsor*,[2] the Court, noting an "evolving understanding of the meaning of equality,"[3] sparked a constitutional revolution. In the 723 days since, the number of states where same-sex unions are legal has more than tripled—from twelve to thirty-seven—three via popular vote,[4] eight via legislative action,[5] and twenty-six via judicial decree.[6]

"Who decides?" is a fateful question. A generation ago in *Baker v. Nelson*,[7] the U.S. Supreme Court ruled in a succinct, one-sentence order that a state's preference for opposite-sex marriage raised no "substantial federal question."[8] Is *Baker* a rule or a relic? Is marriage law still "a virtually exclusive province of the states"[9]—resting properly with state voters and their elected

---

[1] *See Obergefell v. Hodges*, 772 F.3d 388 (6th Cir. 2014), *cert. granted*, 135 S. Ct. 1041 (Jan. 16, 2015) (No. 14-556). The combined petitions, addressing four states' bans on same-sex marriage, actually pose two discrete constitutional questions. First is the so-called "celebration" issue: Can states constitutionally forbid same-sex couples from marrying? Second is the related-but-distinct "recognition" issue: Can states constitutionally refuse to accept the legality of same-sex marriages performed elsewhere? Today's case presents a spin-off "dissolution" issue: Can states constitutionally refuse to grant same-sex divorces?

[2] 133 S. Ct. 2675 (2013).

[3] *Id.* at 2693.

[4] *See* ME. REV. STAT. tit. 19-A, § 650-A (2012); MD. CODE ANN., FAM. LAW §§ 2-201, 2-202 (2013); WASH. REV. CODE ANN. § 26.04.010 (2012).

[5] DEL. CODE ANN. tit. 13, § 129 (2013); HAW. REV. STAT. § 572-1 (2013); 750 ILL. COMP. STAT. 80/10 (2014); MINN. STAT. § 517.01 (2013); N.H. REV. STAT. ANN. § 457:1-a (2010); N.Y. DOM. REL. LAW § 10-a (McKinney 2011); R.I. GEN. LAWS § 15-1-1 (2013); VT. STAT. ANN. tit. 15, § 8 (2009). The District of Columbia has also legalized same-sex unions via legislative action. D.C. CODE § 46-401 (2010).

[6] *See, e.g.*, *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014), *petition for cert. filed*, (U.S. Dec. 30, 2014) (No. 14-765) (invalidating Idaho and Nevada bans on same-sex marriage under the federal Constitution); *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir.), *cert. denied*, 135 S. Ct. 265 (2014) (same for Utah); *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir.), *cert. denied*, 135 S. Ct. 286 (2014) (same for Virginia); *Bishop v. Smith*, 760 F.3d 1070 (10th Cir.), *cert. denied*, 135 S. Ct. 271 (2014) (same for Oklahoma).

[7] 409 U.S. 810 (1972).

[8] *Id.* at 810.

[9] *Sosna v. Iowa*, 419 U.S. 393, 404 (1975).

representatives rather than with judges—or has *Baker* been swamped by doctrinal developments, overtaken if not overruled?

The High Court in Washington, D.C. will soon speak. The High Court in Austin, Texas will not. This Court holds the merits are unreachable because of an insurmountable procedural hurdle that, distilled down, poses fundamental questions about the attorney general's powers, including his ability to defend Texas law against perceived, implicit constitutional attack. Specifically, the Court concludes the attorney general blundered the State's right to intervene, rendering the State of Texas procedurally powerless to assert its argument that Texas law deprives state courts of jurisdiction in same-sex divorce proceedings. More to the point: This Court lacks jurisdiction to say Texas courts lack jurisdiction.

Today's decision turns on state procedural law, not federal constitutional law, but procedural matters matter. Intervention is an equitable doctrine, and I simply balance the equities differently. Some may frame this case as a purely *private* dispute, which is precisely the issue: whether weighty *public* concerns—the application and constitutionality of Texas marriage law— are sufficiently intertwined to warrant hearing from the State. In my view, the State's chief legal officer—sworn to "preserve, protect, and defend" Texas law[10]—should in fact be permitted to preserve, protect, and defend it. I would allow the attorney general to make his argument that Texas law imposes an absolute jurisdictional constraint and constitutionally prohibits a judge not only from performing a same-sex marriage but also from dissolving one.

The attorney general may be right. He may be wrong. But he should be heard.

I respectfully dissent.

---

[10] TEX. CONST. art. XVI, § 1.

## I. Background

In this case, a Massachusetts-married couple, Angelique Naylor and Sabina Daly, was initially split over splitting. Daly contested the divorce, and her answer to the divorce petition included a motion to dismiss and/or declare the marriage void. Her motion explained that the "Court does not have subject matter jurisdiction over this matter because Petitioner is asking the Court to recognize and enforce a marriage between two persons of the same sex which is contrary to the law and public policy of the State of Texas." Daly also argued that "the 'marriage' between Petitioner and Respondent is invalid . . . and the parties do not qualify for a divorce." The State considered this the correct legal argument and, as a result, merely monitored the litigation rather than intervening right away.

The trial court doubted its own jurisdiction, repeatedly remarked on the "very important" constitutional issues, called the case "quite a legal mess," and fretted its jurisdiction could "only be resolved by constitutional analysis, none of which has been fully briefed." That briefing and constitutional analysis never happened. The next day, after learning the attorney general's office was observing the proceedings, Daly abruptly scrapped her jurisdiction/voidance argument. She and Naylor promptly settled and asked the court to grant an agreed divorce decree, which the court announced from the bench. The State sought intervention the next day, before the court signed its judgment but after the court had verbally granted "an ostensible divorce."[11] The court did not allow intervention and did not rule on the State's plea to the jurisdiction. Acknowledging that "interesting constitutional issues" and "jurisdictional question[s]" existed, the court urged the State to take it up with the court of appeals—which ultimately held the State lacked any standing to appeal.

---

[11] *Ante*, at 2.

4

The parties' settlement agreement is interestingly worded. It acknowledges that same-sex divorce might be unavailable under Texas law and notes the parties requested a divorce decree "to the extent" the trial court had "the power to do so." The trial court's divorce decree is unique, too. While declaring the parties divorced and the marriage "dissolved," as did the settlement agreement, it concedes that the divorce "might not be legal in the State of Texas," and if so, the order "is intended to be a substitute for . . . a valid and subsisting divorce of these parties." Similarly, the property-rights section of the decree purports to divide "any marital estate *that might exist*." (emphasis added). The State dismisses these lawyerly turns of phrase as a semantic ruse and contends the parties have supplanted our adversarial legal system with an "illegal agreed judgment" that flouts Texas law by enshrining an "unconstitutional divorce decree."

Are these parties lawfully divorced or not? Uncertainty abounds regarding a matter that demands—and deserves—certainty. Is their Massachusetts marriage intact, dissolved, or in some domestic-relations netherworld? They don't know. More than 3,200 Texas judicial officers don't know. Four hundred seventy-eight district and county clerks don't know. One hundred eighty-one members of the Legislature don't know. The attorney general doesn't know. The Governor doesn't know. Twenty-seven million Texans don't know. The Court says it cannot say. I would not allow such nagging uncertainty to cloud such a fundamental question.

Indecision breeds insecurity. If the attorney general is correct, then the trial court lacked subject-matter jurisdiction, meaning the divorce decree in this case is void and forever vulnerable to collateral attack at any time (unless the Texas Constitution and Family Code are themselves unconstitutional).[12] Is the State of Texas so procedurally powerless to defend Texas laws against

---

[12] *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993) ("Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties.").

5

perceived, implicit constitutional attack that even jurisdictionally barred (and thus void) rulings can escape appellate scrutiny?

The Court does not confront the attorney general's core argument: Texas courts cannot grant same-sex divorces without judicially invalidating Texas law. The issue is present but cannot be presented. I believe prudent equitable considerations weigh in favor of hearing from the State.

## II. Discussion

The Court is correct that intervention after judgment is disfavored.[13] "There is no deadline for intervention,"[14] however, and our law makes room for case-by-case exceptions. Years ago, a trial judge in Beaumont vacated a same-sex divorce decree after the attorney general intervened post-judgment to assert the lack of subject-matter jurisdiction.[15] Just last year, this Court upheld *sub silentio* the State's post-judgment intervention in a private suit in order to assert that a proposed *cy pres* award in a class-action settlement violated the Unclaimed Property Act (UPA).[16] We ultimately rejected the attorney general's view that the UPA applied, but we considered his post-judgment intervention wholly unremarkable, never doubting his justiciable interest in ensuring that state law was defended.[17]

---

[13] *Ante*, at 5. "Ordinarily, a trial court does not abuse its discretion by denying a motion to intervene after the court has rendered a final judgment." *In re Lumbermens Mut. Cas. Co.*, 184 S.W.3d 718, 725 (Tex. 2006) (*Lumbermens I*).

[14] *Tex. Mut. Ins. Co. v. Ledbetter*, 251 S.W.3d 31, 36 (Tex. 2008).

[15] *See* Melissa Drosjack, *Gay couple won't get Texas divorce*, Houston Chronicle (March 29, 2003).

[16] *Highland Homes v. State*, 448 S.W.3d 403, 408 (Tex. 2014).

[17] Ultimately, the Court held that "the State's argument for the application of the [UPA] cannot succeed unless class representatives' authority to act for class members under Rule 42 is disregarded." *Id.* at 412. Having implicitly approved of the trial court's determination "that Plaintiffs and Class Counsel . . . have adequately represented the interests of the Settlement Class," *id.* at 408, it would have been a simple matter for the Court to hold that there was no interest for the attorney general to represent, leaving him without a justiciable interest to represent and leaving the Court without jurisdiction over questions arising from his intervention.

Moreover, despite ultimately holding the UPA inapplicable, we did not treat the appropriateness of intervention as turning upon whether the parties had squarely litigated the UPA's applicability. In addition, although

6

Here, there looms a fundamental, threshold issue—whether Texas courts even have *jurisdiction* in same-sex divorce proceedings—an issue that couples seeking dissolution have an understandable desire to minimize. The State adamantly insists that granting a same-sex divorce necessarily means declaring state law unconstitutional, which, if true, means void judgments forever vulnerable to challenge: "There is no finality in a void decree issued without jurisdiction." As the trial court admitted—openly, candidly, and repeatedly—significant issues permeate this case, and they deserve genuine adversarial presentation and painstaking judicial review.

## A. The virtual-representation doctrine, as historically articulated, may not apply, but a formulation amenable to threshold jurisdictional arguments might.

As the Court notes, the rule disfavoring post-judgment intervention is sometimes relaxed under the virtual-representation doctrine.[18] This is an equitable doctrine to be applied flexibly— not "a crisp rule with sharp corners" but one that "must be determined on a case-by-case basis."[19] For example, we have allowed a subrogee to intervene post-judgment when the subrogee's interest was "adequately represented and then suddenly abandoned by someone else."[20] We have stressed the "novel posture," "unique facts," and "unusual circumstances" of a case to grant mandamus relief so an insurer could intervene on appeal to raise an issue its insured had abandoned.[21] In *Motor Vehicle Board v. El Paso Independent Automobile Dealers Ass'n*,[22] local officials initially

---

the parties took it upon themselves to notify the attorney general of the proposed *cy pres* award, *id.* at 408, it escapes me how notifying the attorney general of a suit could provide him with a justiciable interest he otherwise would have lacked.

[18] *See Lumbermens I*, 184 S.W.3d at 726 ("While other equitable factors may weigh against allowing a virtually-represented party to invoke appellate rights, the mere fact that the party does not attempt to invoke those rights until after judgment, when the need to invoke them arose, is not dispositive.").

[19] *Id.* at 725 (internal quotation marks omitted).

[20] *Ledbetter*, 251 S.W.3d at 36.

[21] *Lumbermens I*, 184 S.W.3d at 720, 726–27.

[22] 1 S.W.3d 108 (Tex. 1999).

defended the constitutionality of a state statute.[23] The attorney general was aware of the lawsuit but chose not to intervene because one party was already making the proper arguments.[24] When the party abruptly abandoned its defense of the statute and agreed to a settlement invalidating it, the State intervened, and we permitted the State's appeal.[25]

The Court points mainly to the court of appeals' explanation as to why virtual representation is a tough sell. The State itself concedes this dispute is "not a prototypical virtual-representation case." Nonetheless, it argues virtual representation is warranted, as we have stated, "in order to vindicate important rights,"[26] such as when parties displace our adversarial system with a "legally baseless agreed judgment" that subverts the State's inherent right to defend Texas law against constitutional attacks. The State notes that our decisions, which are mindful of the virtual-representation doctrine's equitable roots, have focused on a case's unique posture and novel circumstances when allowing tardy intervention.

That said, and as the State acknowledges, this case "does not map perfectly onto the virtual-representation doctrine." I do not disagree it is a stretch under our historic articulation of the doctrine. Other jurisdictions' formulations seem better suited to this uncommon context, where core issues of subject-matter jurisdiction, resulting void judgments, and state-law constitutionality are present but apt to elude review given the understandable desire of non-adversarial parties to play things down.[27] Perhaps one sensible, limiting consideration in this context—where the trial

---

[23] *Id.* at 110.

[24] *See id.*

[25] *Id*. at 110–11.

[26] *Lumbermens I*, 184 S.W.3d at 723.

[27] For example, in the Second Circuit, "a nonparty may appeal when the nonparty has an interest *that is affected* by the trial court's judgment," not just when the nonparty can show he is legally *bound* by the judgment. *See United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL-CIO*, 931 F.2d 177, 183 (2d Cir. 1991) (emphasis added) (internal quotation marks omitted). That less-rigid articulation seems a more

court itself voices doubts regarding subject-matter jurisdiction and constitutionality—should be whether the "virtually represented" party, here the State of Texas, had a meaningful opportunity to intervene following the abrupt abandonment of its jurisdictional argument.

But putting aside virtual representation and whether to allow some exceedingly narrow variant on these unique facts, I believe numerous equitable considerations weigh in favor of the State's right to speak when the constitutionality of its laws is questioned, however obliquely, particularly when done so through artfully worded judgments that at once underscore and undermine appellate scrutiny of vital issues of jurisdiction and constitutionality.

### B. Prudent equitable principles support the State's intervention argument.

The Court says the State lacks standing to intervene on appeal, a prerequisite to our jurisdiction. The State says the jurisdictional defect is far more fundamental: Texas courts lack jurisdiction over same-sex divorces entirely.

This is a controversial case—undeniably—but that is not the reason the State deserves the right to be heard. The issue is less subject matter than subject-matter jurisdiction. The attorney general insists that Texas courts have no judicial power to dissolve a same-sex marriage (the precise position Daly initially argued and that the trial court openly worried about). The Court

---

sensible fit where the attorney general's underlying rationale for intervention is the judicial branch's utter lack of subject-matter jurisdiction.

The Court today emphasizes, "the State is not bound by the disputed divorce decree." *Ante*, at 8. The State fully agrees, but not because it concedes a lack of involvement—or lack of stake—in the proceedings. Rather, it "is not bound by the district court's void divorce decree—and neither are Respondents or anyone else, as a void judgment issued without jurisdiction can never be enforced." If this legal position is sufficient to defeat application of the virtual-representation doctrine, then no party could ever be virtually represented in a proceeding in which the trial court lacked subject-matter jurisdiction. The very reason the State concedes it is not bound—indeed, why *nobody* is—is because it is impossible for anyone to be bound by a void judgment issued by a jurisdiction-less court.

The State is speaking an entirely different legal vocabulary. While not *bound* it is certainly *constrained*, powerless to uphold laws that will be steadily stiff-armed (as the State sees it) until it timely discovers a proceeding in a court willing to entertain its jurisdictional arguments. As for identity of interest, the State's interest here is plainly put—the enforcement and constitutionality of Texas law—but it's difficult to have identity of interest about enforcement and constitutionality with litigants who want no talk of enforcement and constitutionality.

9

today does not address this question, saying the attorney general waited too long to raise it. But if the attorney general is right, then this couple is not divorced, and the trial court's decree can be collaterally attacked for as long as they both shall live. The State of Texas and these parties deserve a definitive, once-and-for-all ruling on whether state judges possess the authority to grant same-sex divorces. The State's ability to raise the issue should not turn on its ability to monitor divorce filings in every clerk's office in the State in order to intervene promptly.

At the same time, it is precisely the notoriety of the underlying issue, and the attorney general's demonstrated record of engagement, that might spur litigants to wire around intervention. Recently, a state judge in Travis County quietly signed an order barring enforcement of Texas's traditional marriage laws.[28] I use the word "quietly" because the court elected not to advise the attorney general of any constitutional question, thus depriving the State's chief legal officer of his statutorily mandated opportunity to defend Texas law.[29] Moreover, the constitutional validity of Texas marriage law was pending in this Court. A similar thing happened in San Antonio last year,[30]

---

[28] The judge issued a temporary restraining order enjoining the county clerk from "relying on the unconstitutional Texas prohibitions against same-sex marriage as a basis for not issuing a marriage license to" a specific couple. *Goodfriend v. Debeauvoir*, No. D-1-GN-15-000632 (Travis Cnty. Dist. Ct. Feb. 19, 2015).

[29] *See* TEX. GOV'T CODE § 402.010(a) ("The court shall, if the attorney general is not a party to or counsel involved in the litigation, serve notice of the constitutional challenge and a copy of the petition, motion, or other pleading that raises the challenge on the attorney general. . . ."). Even if the attorney general *had* received such notice, however, it likely would have been difficult to mount any defense of constitutionality in the time that elapsed between the trial court's order allowing the plaintiffs to file their initial pleadings in paper form—marked as 8:51 a.m. on February 19, 2015—and the trial court's subsequent order finding that the "unconstitutional statutory and state constitutional prohibitions in Texas against same-sex marriage" were causing the plaintiffs immediate and irreparable damage—marked as 8:52 a.m. on February 19, 2015.

[30] *In re State*, No. 04-14-00282-CV, 2014 WL 2443910, at *4 (Tex. App.—San Antonio May 28, 2014, orig. proceeding) (holding the trial court abused its discretion when it declared Texas marriage law unconstitutional without first notifying the attorney general of the constitutional challenge).

all in the face of Texas law that requires notice and forbids state courts from declaring a statute unconstitutional before the 45th day after notice is served on the attorney general.[31]

I understand that in certain proceedings everyone in the courtroom—litigants, counsel, and judges alike—may prefer no involvement by the attorney general. But Texas law *commands* involvement by the attorney general, no matter how righteous or urgent the cause is thought to be. That's precisely the point of the notice law. The Legislature has determined that state law is entitled to a vigorous defense. The attorney general isn't omnipresent, able to monitor every filing in every courthouse across 254 counties. The tension is between what the parties logically want (their case off the radar) and what Texas legally requires (their case on the radar). The notice law recognizes, and forthrightly aims to thwart, the desire to engage in procedural corner-cutting to avoid unwanted attention.

The legal airtightness of a same-sex couple's divorce cannot hang on a reed so thin and fortuitous as whether the attorney general got wind of the case and was timely heard by the court. His awareness is irrelevant to the core issue: whether the dissolution implicates and invalidates Texas law. Can a court dissolve a marriage, same-sex or otherwise, without first recognizing and validating the marriage? A couple may adamantly dispute whether they are disputing constitutionality. That is likewise irrelevant to the core issue: whether the dissolution implicates and invalidates Texas law. Again, if the attorney general is correct that Texas courts lack jurisdiction, then this "divorce" is void and forever challengeable. Even those with polar opposite views on the constitutionality of same-sex marriage must agree: That sort of legal purgatory benefits nobody.

---

[31] *See* TEX. GOV'T CODE § 402.010(b) ("A court may not enter a final judgment holding a statute of this state unconstitutional before the 45th day after the date notice required by Subsection (a) is served on the attorney general.").

11

On matters of this consequence, when there is such hard-wired incentive for artful pleading, semantic gamesmanship, and tactical shortcuts in order to evade adversarial presentation and judicial review of momentous jurisdictional and constitutional issues, I would banish all uncertainty. Does Texas law allow same-sex couples to divorce or not? And if not, does that violate the United States Constitution? Let us decide once and for all and be done with it.

### 1. Subject-matter jurisdiction is always front and center and must always be confirmed.

"Subject matter jurisdiction is never presumed and cannot be waived."[32] No jurisdiction equals no judicial power, meaning courts always have an affirmative duty to confirm jurisdiction exists. A court without jurisdiction has power to do only one thing: dismiss.[33] Conversely, any action other than dismissal necessitates an inference that the court believed its action properly surmounted any jurisdictional obstacles. Given the judiciary's *sua sponte* duty to ensure subject-matter jurisdiction, a party's pleadings will *always* place jurisdictional requisites at issue.

In a same-sex divorce action, even if no party points to the Family Code or to the Texas Constitution as posing jurisdictional hurdles (or notes the attendant federal constitutional implications), courts must independently confirm their own jurisdiction, including awareness that Texas law might have something to say about the matter—and that the federal Constitution could be implicated, too. By granting a same-sex divorce, a Texas trial court implicitly holds it has subject-matter jurisdiction, either because the Family Code and Texas Constitution do not bar jurisdiction, or because any putative jurisdictional bars are unconstitutional under the federal

---

[32] *Tex. Ass'n of Bus.*, 852 S.W.2d at 443–44. *See Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 379 (Tex. 2006) ("Subject-matter jurisdiction cannot be waived or conferred by agreement [and] must be considered by a court *sua sponte*. . . ."). *See also Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004) ("The trial court must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed.").

[33] *City of DeSoto v. White*, 288 S.W.3d 389, 393 (Tex. 2009).

Constitution. The trial court here, having bluntly fretted about the "interesting constitutional issues" and "jurisdictional question[s]," knew its ruling was implicating serious matters.

## 2. Limits on subject-matter jurisdiction merit genuine adversarial presentation.

A legislature's ability to limit courts' subject-matter jurisdiction helps disaggregate power among the three branches, but once established, the power to enforce jurisdictional limits transfers entirely to the judiciary itself. Judges, in a sense, judge themselves, having final say on how the jurisdictional limitations placed upon them are construed.

Typically, adversarial presentation by opposing parties helps mollify this concern. But where the parties are not oppositional, and given the courts' jurisdictional self-policing, we have reason to be watchful. This case is illustrative. Parties seeking a hassle-free, no-fault divorce have zero incentive to challenge the trial court's subject-matter jurisdiction. Here, although Daly initially disputed the trial court's jurisdiction, she later abandoned that view, and the parties swiftly bridged their differences.[34]

As noted above, jurisdiction is an omnipresent issue, and where no party challenges it, and has no incentive to, courts must still address it. Thus, one irony of jurisdictional issues is their persistence in the absence of adversarial presentation.

In my view, a court inclined to restraint should receive—not grudgingly but gratefully— arguments from the attorney general on alleged bars to the court's jurisdiction, particularly when the nature of the proceedings removes any expectation the parties themselves will speak up. The intervention of the attorney general does not imperil the independence of the judiciary to adjudicate

---

[34] The pleadings suggest Daly abandoned her jurisdiction argument and the parties resolved their property dispute after they became aware the attorney general was monitoring the courtroom proceedings.

disputes, but it does ensure the virtuous check of adversarial presentation where there would otherwise be none.

### 3. *In*direct constitutional attacks deserve zealous attorney general advocacy, too.

I am confident the Court agrees the attorney general may intervene in private litigation when a party *directly* attacks a law's constitutionality. The Legislature presumes the same, indeed *promotes* it, requiring notice to the attorney general at least 45 days before judgment in order to give the State the opportunity to intervene.[35] All three branches of government agree: The attorney general gets to intervene when a party launches a direct constitutional attack on Texas law. But what if the attorney general is convinced Texas law is being *implicitly* attacked, not overtly but covertly? In other words, the trial court cannot grant the relief requested without first implicitly holding an alleged jurisdictional limitation unconstitutional? (I wonder if the Court would allow *post-judgment* intervention had the trial court *explicitly* declared state law unconstitutional.)

I see no meaningful, nonartificial distinction between a direct constitutional challenge and this case. Here, the risk that section 6.204(a) of the Family Code or Article I, section 32(a) of the Texas Constitution will be declared unconstitutional is present even if neither party to the divorce expressly attacks those laws. Parties may not realize Texas law might bar the proceeding. That's precisely why courts have an independent, *sua sponte* duty to confirm jurisdiction exists. Here, Daly actually raised jurisdiction, initially arguing the trial court had none, and the trial court itself candidly spoke of the significant jurisdictional and constitutional uncertainties.

Here, the trial court necessarily, if tacitly, weighed in on the application of section 6.204. In order to determine it had subject-matter jurisdiction, the court had to hold section 6.204 either

---

[35] TEX. GOV'T CODE § 402.010(a)–(b).

14

inapplicable or invalid. If inapplicable, it would have been unnecessary to reach validity.[36] On the other hand, if the trial court determined that section 6.204 applies to divorces, it *must* have also determined the section was invalid in order to grant relief.[37]

Even *absent* State intervention, however, a trial court could well realize on its own, as this one did, that jurisdictional issues were at play, and then proceed to declare Texas law unconstitutional, without the State ever uttering a peep in defense. Just as a raised constitutional issue may be unaddressed, an unraised constitutional issue may be addressed, particularly where such a determination relates to the boundaries of the court's own power. Laws can be invalidated whether or not litigants flag constitutionality. So why would attorney general intervention be appropriate only when a party *expressly* attacks Texas law? Express or implicit, direct or indirect— indeed, raised or unraised—Texas law is potentially imperiled.

If the chief legal officer of Texas, sworn to "preserve, protect, and defend" the Constitution and laws of Texas,[38] is convinced that a court is being urged, albeit quietly, to strike something down, State law deserves the State's lawyer. Here, constitutionality was clearly in play; it was not a mere fanciful concern. Daly herself asserted that Texas law barred same-sex marriage, which

---

[36] *See In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) ("As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds."); *In re Doe 2*, 19 S.W.3d 278, 284 (Tex. 2000) ("We have previously cautioned that the constitutionality of a statute should be considered only when the question is properly raised and such determination is necessary and appropriate to a decision in the case.").

[37] By conflating the preference for resolving interpretive choices in favor of constitutionality with the preference for resolving cases without any reference to the Constitution, the court of appeals' opinion presents an erroneous inversion of this determinative order. The court of appeals suggests that because the trial court would have to reach the question of section 6.204's validity unless the section is inapplicable, the court *must* hold that section 6.204 is inapplicable. *See* 330 S.W.3d 434, 441–42.

[38] TEX. CONST. art. XVI, § 1.

15

raises federal constitutional questions, and the trial court forthrightly noted the weighty constitutional and jurisdictional issues at stake.[39]

### 4. The parties seek a divorce declaration that necessarily presumes a valid marriage.

Daly and Naylor asked the trial court to deploy the judicial resources of the State of Texas to effect their dissolution. Specifically, they sought a legal benefit in the form of a legally valid and enforceable divorce decree dividing their assets. In doing so, they asked for something the State's chief lawyer insists the court had no authority to give, at least not without tacitly ruling Texas law unconstitutional.

Texas law forbids giving effect to something that "creates, recognizes, or validates" same-sex marriage.[40] Is dissolving a marriage recognized elsewhere recognizing the marriage here? Is dissolving a valid marriage validating the marriage? The parties disagreed initially but now both say no—their divorce petition, while alleging a valid marriage, does not ask Texas to recognize or validate it. Maybe. The attorney general emphatically says yes—a Texas court cannot undo what it could not itself do. Maybe. The rub is this: If the attorney general's reading of Texas law is correct, the divorce is void and forever vulnerable to collateral attack (unless Texas law is itself unconstitutional).

In the most practical sense, Daly and Naylor sought a formal declaration, however connotative, of the application and validity of Texas's traditional marriage laws. The trial court openly wrestled with all these issues—questioning its own jurisdiction, describing the case as "quite a legal mess," noting the "interesting constitutional issues," and requesting more briefing, before abruptly shifting gears the next day.

---

[39] Even if the State is mistaken that jurisdiction must necessarily be addressed in order to grant a same-sex divorce, the incorrectness of that view does not mean the State lacks standing to make the argument.

[40] TEX. FAM. CODE § 6.204(c)(1).

As noted above, section 402.010 of the Government Code states that when a party challenges the constitutionality of a state statute, the court must serve notice on the attorney general and may not enter final judgment for 45 days following the date of notice. Although the Legislature enacted section 402.010 after the trial court took action in this case,[41] section 402.010 conferred notice, not standing, on the attorney general.[42] His standing to defend statutory and constitutional enactments against constitutional attack *preexisted* section 402.010.[43]

Here, Naylor sought a legally enforceable divorce decree that, according to the attorney general—and with whom Daly initially agreed—was only available if the trial court declared Texas's jurisdictional limitation unconstitutional. While the divorce petition did not expressly seek such a declaration, I would hold that a party cannot circumvent a constitutional issue necessarily, if obliquely, presented—as well as the right of the attorney general to be heard on the matter—by neglecting to mention the issue in his pleading. To hold otherwise would allow litigants to obtain relief the Legislature has prohibited, relief that is available only if the trial court invalidates the prohibition as unconstitutional.

Litigants should not be able to camouflage constitutional questions through artful pleading. State law is sensibly designed to facilitate intervention by the attorney general where the trial court

---

[41] Act of May 24, 2011, 82d Leg., R.S., ch. 808, § 1, 2011 Tex. Gen. Laws 1873.

[42] *Cf.* TEX. GOV'T CODE § 402.010(c) ("A party's failure to file as required . . . or a court's failure to serve notice as required . . . does not deprive the court of jurisdiction or forfeit an otherwise timely filed claim or defense based on the challenge to the constitutionality of a statute of this state.").

[43] Section 37.006(a) of the Civil Practice and Remedies Code imposes a similar notice requirement in the declaratory-judgment context: "When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties." TEX. CIV. PRAC. & REM. CODE § 37.006(a). Section 37.006(b) then makes clear, if it were not already so, that the State has a sufficient interest to be made a party in a case where the original plaintiff seeks a holding that a state statute is unconstitutional: "In any proceeding . . . if the statute . . . is alleged to be unconstitutional, the attorney general of the state must be served with a copy of the proceeding and is entitled to be heard." *Id.* § 37.006(b).

might possibly declare Texas law unconstitutional, and the parties (and the court) are all too happy to leave the law unmentioned—and undefended.

**5. Parties should not be incentivized to circumvent jurisdictional limits by agreement or artful pleading.**

In my view, when (1) the nature of the proceedings suggests the parties lack adverse interests regarding the existence of jurisdiction,[44] and (2) the attorney general believes jurisdiction cannot exist without disregarding and implicitly invalidating Texas law, the attorney general should be allowed to intervene, even one day late, to assert and defend the jurisdictional restriction. This formulation is consistent with courts' treatment of the justiciability of the attorney general's interest in other contexts.

By way of illustration, the Property Code affirmatively recognizes the attorney general's authority to "intervene in a proceeding involving a charitable trust,"[45] but that justiciable interest turns on whether the trust is a charitable one. Although a finding that the trust has a charitable purpose is often implied rather than contested,[46] surely trial courts are not permitted to strike an intervention merely because the court *could* determine that a trust is private rather than charitable. Indeed, this Court last year in *Highland Homes* did not disapprove of the attorney general's post-

---

[44] Similarly, the defendant and collecting class members' lack of a stake in protecting the missing class members' property interests in the settlement agreement was a background concern in *Highland Homes*. *See* 391 S.W.2d at 417 (Devine, J., dissenting) ("The missing parties' property rights can only be preserved if the State is permitted to act as their custodian under the UPA."); *id.* at 418 (noting that the chosen *cy pres* recipient shared the defendant's interests but had no demonstrable connection to the interests of the class members). Aside from protecting the missing class members' property interests, the attorney general's presence was essential to adversarial presentation of an issue that the parties had no reason to raise except to insulate their judgment from a later collateral attack.

[45] TEX. PROP. CODE § 123.002.

[46] *But see Allred v. Beggs*, 84 S.W.2d 223, 228 (Tex. 1935) (rejecting the error brought by the attorney general on appeal because "[w]hen we come to construe this will from its four corners, it becomes evident that it is not a donation to public charity only. . ."); *In re Estate of York*, 951 S.W.2d 122, 125 (Tex. App.—Corpus Christi 1997, no writ) ("We must then determine whether that estate involves the present charitable trust such that the Attorney General may intervene on its behalf."); *Gen. Ass'n of Davidian Seventh Day Adventists, Inc. v. Gen. Ass'n of Davidian Seventh Day Adventists*, 410 S.W.2d 256, 260 (Tex. Civ. App.—Waco 1966, writ ref'd n.r.e.) (rejecting complaint that the attorney general's presence was required in the suit because the trust was not a charitable trust).

18

judgment intervention or retrospectively disapprove of the justiciability of his interest, despite rejecting his argument that the UPA applied—even though presumably the justiciability of the attorney general's interest was contingent upon the presence of unclaimed property.

Nor should parties be permitted to cut off the attorney general's interest before he is able to assert it merely by stipulating that a trust is not a charitable one, or that a settlement does not involve unclaimed property, or by neglecting to affirmatively flag such issues altogether. Such furtiveness would deprive the attorney general of the opportunity to appeal the threshold determination on which his interest is anchored.[47] And it impedes fulfillment of his solemn duty to represent the State and defend Texas law, thus (1) aggrandizing judicial power at the expense of the other branches, and (2) elevating private parties above the electorate whose will was expressed indirectly in our statutes and directly in our Constitution.

Finally, denying the State's intervention in such a suit excludes the only party with an incentive to challenge subject-matter jurisdiction, thus underscoring the structural necessity of his presence to ensure sober jurisdictional review—a review this Court has previously found compelling enough to permit unpreserved challenges on appeal.[48]

---

[47] *But see Allred*, 84 S.W.2d at 227.

[48] As we observed in *Texas Association of Business v. Texas Air Control Board*:

If we were to conclude that standing is unreviewable on appeal at least three undesirable consequences could result. First and foremost, appellate courts would be impotent to prevent lower courts from exceeding their constitutional and statutory limits of authority. Second, appellate courts could not arrest collusive suits. Third, by operation of the doctrines of res judicata and collateral estoppel, judgments rendered in suits addressing only hypothetical injuries could bar relitigation of issues by a litigant who eventually suffers an actual injury.

852 S.W.2d at 445.

19

**C. Alternatively, the Court should grant the State's petition for writ of mandamus in order to allow the attorney general to be heard on subject-matter jurisdiction.**

I also disagree with the Court's refusal to consider the State's mandamus petition as a means of addressing the State's arguments regarding the trial court's subject-matter jurisdiction. As we stated in *Terrazas v. Ramirez*,[49] one "need not be a party to the underlying litigation in order to seek mandamus relief."[50] If the State is correct that the trial court lacked subject-matter jurisdiction to render a divorce decree, then the judgment is void and subject to collateral attack.[51]

Although a petition that is originally filed in the Supreme Court must "state a compelling reason why the petition was not first presented to the court of appeals,"[52] "[r]equest and refusal have not been required for mandamus relief in every case."[53] Thus, we have "expressly excused [the] requirement when the request would have been futile and refusal little more than a formality."[54] Yet the Court still faults the State for failing to state sufficiently compelling reasons why its petition was not first presented to the court of appeals.[55]

---

[49] 829 S.W.2d 712 (Tex. 1991).

[50] *Id.* at 723.

[51] *See Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 863 (Tex. 2010) ("A void order is subject to collateral attack in a new lawsuit, while a voidable order must be corrected by direct attack; unless successfully attacked, a voidable judgment becomes final."); *see also Sanchez v. Hester*, 911 S.W.2d 173, 176 (Tex. App.—Corpus Christi 1995, orig. proceeding) ("Voidable orders are readily appealable and must be attacked directly, but void orders may be circumvented by collateral attack or remedied by mandamus." (citing *Mapco, Inc. v. Forrest*, 795 S.W.2d 700, 703 (Tex. 1990) (orig. proceeding))).

[52] *See* TEX. R. APP. P. 52.3(e).

[53] *Terrazas*, 829 S.W.2d at 724.

[54] *Id.* at 723.

[55] *Ante*, at 16–17. *But see Terrazas*, 829 S.W.2d at 725 ("Although relators might have moved to set aside the judgment in *Quiroz* even after it was rendered, we do not view this as a prerequisite to mandamus in this proceeding.").

20

In rejecting the State's proffered explanations, the Court relies on our per curiam denial of the petition for writ of mandamus in *In re Lumbermens Mutual Casualty Co.*[56] However, that denial was in light of our disposition in a related but separate opinion in which we held that the court of appeals had abused its discretion in denying the petitioner leave to participate in the appeal.[57] In contrast, here, the State will not have an opportunity to participate in further proceedings, and a denial of its petition for writ of mandamus will not be "without prejudice to [its] ability to seek relief from the trial court or the court of appeals."[58]

Although the Court now refuses to consider an "unreviewed mandamus argument,"[59] it is clear that the substance of the State's arguments regarding the trial court's subject-matter jurisdiction were presented to the court of appeals.[60] Thus, the record does not lack for "a request for such performance by the party at interest and a refusal to perform on the part of the court."[61] The court of appeals reviewed the State's arguments that the parties had made an implied constitutional attack[62]—albeit under the assumption that the State brought a direct rather than collateral attack. But so long as the same jurisdictional grounds provide the basis for the court of appeals' decision in either determination, there is no real significance to a distinction between a

---

[56] 184 S.W.3d 729, 730 (Tex. 2006) (*Lumbermens II*).

[57] *Id.* ("In light of this disposition, we deny Lumbermens' petition for writ of mandamus without regard to the merits and without prejudice to Lumbermens' ability to seek relief from the trial court or the court of appeals.").

[58] *Id.*; *see also Williams v. Huntress*, 272 S.W.2d 87, 89 (Tex. 1954) ("This would not be subject to original attack here and within our jurisdiction if relator had an opportunity to correct an error of the trial court by normal appellate procedure.").

[59] *Ante*, at 16.

[60] *See* 330 S.W.3d at 435 ("The State appeals from the final divorce decree of appellees Angelique Naylor and Sabina Daly, asserting that section 6.204 of the family code deprives the trial court of subject-matter jurisdiction.").

[61] *See Hursey v. Bond*, 172 S.W.2d 305, 306 (Tex. 1943).

[62] 330 S.W.3d at 441 ("The State treats Naylor's petition for divorce as an 'implied' constitutional attack on section 6.204 of the family code. . . .").

dismissal of an appeal and a denial of a petition for writ of mandamus in the court of appeals. Such a distinction is solely one of form.[63]

However, because the State purported to file an appeal rather than an original proceeding in the court of appeals, the Court has chosen to ignore the substance of the State's arguments entirely.[64] As a matter of judicial economy,[65] I would instead focus on whether the arguments that the State presented to the court of appeals would entitle the State to mandamus relief and thereby squarely address the justiciability of the State's interest.

### III. Conclusion

It is not uncommon for litigants in our adversarial system to talk past each other and frame cases in polar opposite ways. Daly and Naylor, initially at odds over jurisdiction and constitutionality, now describe this case as a purely private matter. The State of Texas contends legitimate public concerns are at stake. Does Texas law constitutionally deprive state courts of jurisdiction in same-sex divorce cases? The State says yes; the parties say no; the Court does not say. But nobody knows for sure. Has Texas law been judicially invalidated *sub silentio*? The State says yes; the parties say no; the Court does not say. But nobody knows for sure.

I would permit the State to intervene and lodge statutory and constitutional objections to a court's subject-matter jurisdiction, the exercise of which arguably necessitates treating—if not implicitly holding—Texas law as unconstitutional. Here, the State contends the issue of

---

[63] *Cf. Terrazas*, 829 S.W.2d at 724 (noting that we have excused the requirement that a litigant request mandamus relief in the court of appeals when the request would be "little more than a formality").

[64] *But see Mueller v. Saravia*, 826 S.W.2d 608, 609 (Tex. 1992) (reaffirming the policy that appellate courts should resolve cases on substantive grounds rather than procedural technicalities); *Crown Life Ins. Co. v. Estate of Gonzalez*, 820 S.W.2d 121, 121–22 (Tex. 1991) ("[A]ppellant should be given opportunity to have disposition on the merits unless such causes violence to the rules.").

[65] *See, e.g.*, *Clay Exploration, Inc. v. Santa Rosa Operating, LLC*, 442 S.W.3d 795, 802–03 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (providing examples of circumstances under which judicial economy may trump general rules regarding which issues a court may address).

constitutionality is necessarily baked into a same-sex divorce proceeding. The State of Texas has an inherent justiciable interest in defending the constitutionality of its democratically enacted laws and is unquestionably injured when those laws are judicially, if inaudibly, invalidated.

Within days, the U.S. Supreme Court may well constitutionalize a 50-state right to same-sex marriage, and if so, the merits of *that* case (who can marry) will likely subsume the merits of *this* case (who can divorce). But regardless of the vital substantive issue at stake, there are vital standing–intervention–jurisdiction issues, too. The federal constitutional merits lurking in today's case will be addressed within days. But this case also raises significant Texas-specific issues vis-à-vis the State's chief legal officer, and this Court has final say over those. The Court says late is late, and the attorney general cannot tardily assert that the trial court lacked jurisdiction and tacitly declared Texas law unconstitutional. Today's bottom line: This Court lacks jurisdiction to decide if state courts lack jurisdiction.

In my view, the attorney general—constitutionally bound to "represent the State in all suits"[66]—has an interest sufficient to intervene to defend Texas law against perceived constitutional attack. His arguments may not prevail, but he should be allowed to make them.

I respectfully dissent.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** June 19, 2015

---

[66] TEX. CONST. art. IV, § 22.